Francisco **CASTANEDA**, Plaintiff,

v.

The **UNITED STATES** of America, George Molinar, in his individual capacity, Chris Henneford, in his individual capacity, Gene Migliaccio, in his individual capacity, Timothy Shack, M.D., in his individual capacity, Esther Hui, M.D., et al., Defendants.

**Case No. CV 07–07241 DDP (JCx).**

United States District Court, C.D. California.

March 11, 2008.

tion or indictment as amended and be required to plead thereto.
P.C. § 969a.

Adele P. Kimmel, Public Justice, Washington, DC, Conal F. Doyle, Willoughby Doyle, Oakland, CA, for Plaintiff.

Anoiel Khorshid, Keith M. Staub, AUSA–Office of U.S. Attorney, Deborah C. Saxe, Jones Day, Los Angeles, CA, Laura R. Anderson, Jones Day, Cleveland,

OH, James A. Creason, Creason & Aarvig, Riverside, CA, Larry A. Dunlap, Creason & Aarvig, Newport Beach, CA, for Defendants.

## AMENDED ORDER DENYING MOTION TO DISMISS

[Motion filed on January 14, 2008]

DEAN D. PREGERSON, District Judge.

This matter comes before the Court upon the individual Public Health Service Defendants' motion to dismiss for lack of subject matter jurisdiction. After reviewing the materials submitted by the parties and reviewing the arguments therein, the Court DENIES the motion.[1]

## I. LEGAL STANDARD

When reviewing a motion to dismiss, the Court "assum[es] all facts and inferences in favor of the nonmoving party." *Libas Ltd. v. Carillo*, 329 F.3d 1128, 1130 (9th Cir.2003). In addition, where, as here, the motion to dismiss is based upon an alleged lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), "the trial court may rely on affidavits and other evidence submitted in connection with the motion." *Berardinelli v. Castle & Cooke Inc.*, 587 F.2d 37, 39 (9th Cir.1978).

## II. BACKGROUND

On March 27, 2006, Plaintiff Francisco Castaneda—an immigration detainee—informed the Immigration and Customs Enforcement ("ICE") medical staff at the San Diego Correctional Facility that a lesion on his penis was becoming painful, growing in size, and exuding discharge. The next day, Castaneda was examined by Anthony Walker, an ICE Physician's Assistant. Walker's treatment plan called for a urology consult "ASAP" and a request for a biopsy. (Amended Compl. ¶ 37[2]; Doyle Decl. Ex. 1.)

On April 11, 2006, ICE documented that because of Castaneda's family history—his mother died of pancreatic cancer at age 39—penile cancer needed to be ruled out. (Doyle Decl. Ex. 2.) A Treatment Authorization Request ("TAR") was filed with the Division of Immigration Health Services ("DIHS"), requesting approval for a biopsy and circumcision. The TAR noted that Castaneda's penile lesion had grown, that he was experiencing pain at a level 8 on a scale of 10, and that the lesion had a "foul odor." (*Id.* Ex. 3.) By this time, DIHS had determined that certain "possible infections" were not causing the lesion. (*Id.*) The TAR further urged that, "[d]ue to family history and pt [patient] discomfort," a biopsy and "pertinent surgical f/u [follow up]" should be performed the "sooner the better." (*Id.*) DIHS approved the TAR, authorizing the biopsy, urology consult, and "pertinent surgical f/u," on May 31. (*Id.*)

On June 7, 2006, ICE sent Castaneda for a consult with oncologist John Wilkinson, M.D. Castaneda presented with a history of a fungating lesion[3] on his foreskin. (*Id.* Ex. 4.) Dr. Wilkinson

1. The initial order was issued with the Plaintiff's name spelled incorrectly. Other than that adjustment, this amended order is identical to the initial order.

2. Defendants' motion to dismiss was filed before the Complaint was amended. However, the Amended Complaint contains no new allegations against the individual federal defendants and the parties have stipulated that Defendants' motion is responsive to the Amended Complaint.

3. The National Cancer Institute defines a "fungating lesion" as: "A type of skin lesion that is marked by ulcerations (breaks on the skin or surface of an organ) and necrosis (death of living tissue) and that usually has a bad smell. This kind of lesion may occur in many types of cancer, including breast can-

agree[d] with the physicians at the [M]etropolitan [C]orrectional Center that this may represent either a penile cancer or a progressive viral based lesion. I *strongly agree* that it requires *urgent urologic assessment of biopsy and definitive treatment.* In this extremely delicate area and [sic] there can be considerable morbidity from even benign lesions which are not promptly and appropriately treated. . . . I spoke with the physicians at the correctional facility. *I have offered to admit patient for a urologic consultation and biopsy. Physicians there wish to pursue outpatient biopsy which would be more cost effective. They understand the need for urgent diagnosis and treatment.*

(*Id.* (emphasis added).) On the same day, Defendant Esther Hui, M.D., spoke to Dr. Wilkinson. She noted that she was aware that Mr. Castaneda "has a penile lesion that needs to be biopsied," and that Dr. Wilkinson had offered to admit Castaneda and perform this procedure. (*Id.* Ex. 5.) However, Dr. Hui explained that DIHS would not admit him to a hospital because DIHS considered a biopsy to be "an *elective* outpatient procedure." (*Id.* (emphasis added).) Dr. Hui never made arrangements for the outpatient biopsy.

On June 12, 2006, Castaneda filed a grievance asking for the surgery recommended by Dr. Wilkinson, stating that he was "in a considerable amount of pain and I am in desperate need of medical attention." (*Id.* Ex. 6.) This grievance was denied. DIHS records from June 23 document that Castaneda's penis was "getting worse, more swelling to the area, foul odo[r], drainage, more difficult to urinate, bleeding from the foreskin." (*Id.* Ex. 7.) DIHS records from June 30, 2006 state that because Castaneda had not yet had "a

biopsy performed and evaluated in a laboratory," the agency considered him to "NOT have cancer at this time." (*Id.* Ex. 8.) DIHS acknowledged that "the past few months of the lesion [had been] looking and acting a bit more angry," yet dismissed Castaneda's concerns: "Basically, this pt needs to be patient and wait." (*Id.*)

DIHS records from one month later document that the "lesion on his penis is draining clear, foul malodorous smell, culture[s] before were negative for growth, negative RPR, negative HIV. [F]oreskin is bleeding at this time and pt states his colon feels swollen, previous rectal exam showed slightly swollen prostate, deferred today." (*Id.* Ex. 9.) Despite Dr. Wilkinson's emphasis over a month earlier on the need for a biopsy due to the considerable likelihood of cancer, DIHS claimed to have no idea what could be causing Castaneda's ailment, noting the "unk[nown] etiology of [his] penile lesion." (*Id.* Ex. 9.)

On the same day, a report by Anthony Walker claims that Castaneda "was not denied by Dr. Hui any treatment, albeit there was no active Treatment Authorization Request (TAR) placed for approval by DIHS headquarters in Washington, DC, *nor was there an emergent need.*" (*Id.* Ex. 10 (emphasis added).) Despite the alleged lack of "emergent need," the next day a TAR was submitted seeking Emergency Room ("ER") evaluation and in-patient treatment for Castaneda. There is no explanation for why ICE did not schedule him for the circumcision and biopsy ordered by Dr. Wilkinson the month before. However, the TAR did note that Dr. Wilkinson and Dr. Masters, an outside urologist,

both *strongly recommended* admission, urology consultation, surgical interven-

cer, melanoma, and squamous cell carcinoma, and especially in advanced disease." *See* http://www.cancer.gov/Templates/dbalpha.

aspx?print=1&cdrid=367427 (last accessed February 17, 2008).

tion via biopsy/exploration under anesthesia to include circumcision if nonmalignant, return f/u with oncology depending upon findings, and potential treatment or surgery of any malignant findings.... There is now bleeding, drainage, malodorous smell and the lesion now appears to be "exploding" for lack of better words, definitely macerated. Request for urology and oncology *inpatient* eval[uation] and treatment with outpatient follow-up.

(*Id.* Ex. 11 (emphasis added).) The TAR was approved. (*Id.*)

Inexplicably, DIHS failed to arrange for an evaluation with Dr. Wilkinson and/or Dr. Masters, the treating doctors who were familiar with Castaneda's condition and who, indeed, had offered to continue treating him. Instead, DIHS brought Castaneda to the ER at Scripps Mercy Chula Vista on July 13, 2006. There, Dr. Juan Tovar, M.D., who examined Castaneda, documented the existence of a 1.5cm by 2cm "fungating lesion with slight clearish discharge." (*Id.* Ex. 12.) Dr. Tovar made arrangements for Castaneda to be admitted to the hospital; his impression was that Castaneda had a "penile mass" and that there was a need to "rule out cancer, versus infectious etiology." (*Id.*)

Once admitted, yet another doctor unfamiliar with Castaneda's history, Dr. Daniel Hunting, M.D., performed a brief examination the same day, but *did not* do the biopsy needed to rule out cancer. Instead, Dr. Hunting guessed that the problem was condyloma, commonly known as genital warts. (*Id.* Ex. 13.) There is no evidence from his report that Dr. Hunting asked about or was aware of Castaneda's family history of cancer. Dr. Hunting then referred Castaneda back to his "primary treating urologist," dismissed his symptoms as "not an urgent problem," and discharged him from the hospital. (*Id.*)

Four days later, Castaneda's condition was worsening. DIHS documented that the lesion was still "growing," and that Castaneda had "severe phimosis,[4] bleeding, and clear drainage for lesion area with foul odor." (*Id.* Ex. 14.) The DIHS record notes that both Dr. Masters and Dr. Wilkinson "strongly recommended" admission to a hospital, biopsy, and circumcision. (*Id.*) Instead, DIHS followed the suggestion of Dr. Hunting—who had only briefly examined Castaneda in the ER—and assumed Castaneda had genital warts. DIHS therefore declined to order a biopsy, although it nonetheless noted Castaneda would "need a resection [5] of the penis" due to the severity of his condition. (*Id.*)

On July 26, 2006, DIHS acknowledged that Castaneda "complains that he is being denied a needed surgery to his foreskin." (*Id.* Ex. 16.) ICE told Castaneda, however, that "while a surgical procedure might be recommended long-term, that does not imply that the Federal Government is obligated to provide that surgery if the condition is not threatening to life, limb or eyesight." (*Id.*) On August 9, DIHS again noted Plaintiff's "inflamed foreskin," but denied his request for a circumcision, claiming that "surgical removal, at the current time, would be considered elective surgery; that as such the Federal Government will not provide for such surgery." (*Id.* Ex. 17.)

---

4. Phimosis is medically defined as a "tightness or construction of the orifice of the prepuce arising either congenitally or from inflammation, congestion, or other postnatal causes and making it impossible to bare the glans." *Merriam Webster's Medical Desk Dictionary* 613 (1996). In other words, the foreskin is so tight it cannot be pulled back completely to reveal the glans.

5. Resection means the surgical removal of part of an organ. *Webster's Medical Desk Dictionary* at 697.

On August 11, 2006, Walker submitted a TAR requesting a biopsy and circumcision by Dr. Masters, the outside urologist. (*Id.* Ex. 18.) Dr. Masters examined Castaneda on August 22. Dr. Masters thought Castaneda might have genital warts, but noted Castaneda's family history of cancer and that Dr. Wilkinson had recommended a "diagnostic biopsy" to rule out cancer. (*Id.* Ex. 19.) Therefore, Dr. Masters recommended circumcision, which would at once relieve the "ongoing medical side effects of the lesion including infection and bleeding" and "provide a biopsy." (*Id.*) Dr. Masters told DIHS that "we will arrange for admission for circumcision at a local hospital. My principal hospital is Sharp Memorial." (*Id.*)

In spite of this unequivocal recommendation, Walker characterized Dr. Masters as stating that "elective procedures this patient may need in the future are cytoscopy and circumcision." (*Id.* Ex. 20.) The word "elective" does not appear in Dr. Masters's report. DIHS denied the request for a circumcision. (*Id.*) On August 24, 2006, DIHS told Castaneda that, "according to policy," surgery was denied because it was "elective." (*Id.* Ex. 21.) On August 26 and 28, Castaneda was seen by medical staff because of "complaints of stressful situation regarding medical status, unable to sleep at night; states that ICE won't allow surgical operation for lesion on penis." (*Id.* Ex. 22.) ICE was thus aware that Castaneda's "stress is due to a chronic medical problem which the CCA has refused to have corrected as it is considered to be elective surgery." (*Id.*) Castaneda was prescribed an antihistamine as treatment. (*Id.*)

On August 30, 2006, ICE sent Castaneda a letter:

> This is to inform that the off-site specialist you were referred to for your medical condition reports that any surgical intervention for the condition would be elective in nature. An independent review by our medical team is in agreement with the specialist's assessment. The care you are currently receiving is necessary, appropriate, and in accordance with our policies.

(*Id.* Ex. 23.) As noted, Dr. Wilkinson's and Dr. Masters's reports do not in fact state that the recommended biopsy and circumcision would be elective. On the contrary, Castaneda's treating doctors, as discussed, both noted the urgency of the situation and made efforts to see Castaneda treated as quickly as possible.

On September 8, 2006, Castaneda complained: "I have a lot [sic] pain and I'm having discharge." (*Id.* Ex. 24.) ICE noted that Castaneda's current treatment was Ibuprofen (800mg), which was having "no effect" on his pain; Castaneda was having "white discharge at night," and he worried that "It's getting worse. It's like genital warts, but they're getting bigger." (*Id.*) By October 17, 2006, ICE medical staff was aware that Castaneda was bleeding from his penis; one officer "saw some dried blood on his boxers." (*Id.* Ex. 26.) On October 23, Walker submitted a TAR for surgery, but it was denied on October 26 because "circumcisions are not a covered benefit." (*Id.* Ex. 27–28.)

In the October 26 denial report, Defendant Claudia Mazur, a DIHS nurse, stated that "Pt has been seen by local urologist and oncologist and both are not impressed of possible cancerous lesion(s), however, there is an elective component to having the circumcision completed." (*Id.* Ex. 28.) This conclusion directly contradicts the July 13 TAR, which documented that Drs. Wilkinson and Masters both "strongly recommended ... surgical intervention via biopsy/exploration" to rule out cancer. (*Id.* Ex. 4, 11, 19.) The TAR also documented that Castaneda "is not able to be released to seek further care due to mandatory hold and according to ICE authori-

ties, may be with this facility for quite awhile." (*Id.* Ex. 28.) This document thus suggests ICE officials *knew* that Castaneda would be unable to receive treatment in the foreseeable future.

DIHS noted that Castaneda's symptoms "have worsened" on November 9. (*Id.* Ex. 29.) Castaneda reported "a constant pinching pain, especially at night. States he constantly has blood and discharge on his shorts. [Castaneda stated] it's getting worse, and I don't even have any meds—nothing for pain and no antibiotics." (*Id.*) Castaneda also "complains of a swollen rectum which he states make bowel movements hard." (*Id.*) Castaneda was told that the "TAR was in place for surgery and is pending approval." (*Id.*) Yet the surgery was not provided.

Instead, on November 14 and 15, DIHS documented that Castaneda "complains of new, 2nd penile lesion on underside, distal penis." (*Id.* Ex. 30.) ICE noted that Castaneda was concerned "that his lesion 'is growing'" and that it is "moist," that "he cannot stand and urinate because the urine 'sprays everywhere' and he cannot direct the stream." (*Id.*) DIHS treated this condition by making a request for seven pairs of clean boxer shorts weekly. (*Id.*)

In early December, Castaneda was transferred to the San Pedro Service Processing Center. (Jawetz Decl. Ex. 1.) ACLU lawyers began to advocate on his behalf. On December 5, 2006, the ACLU sent a letter to multiple ICE officials, including Defendants Chris Henneford, Stephen Gonsalves, and George Molinar. The letter stated, in part, that "Mr. Castaneda, who has a strong family history of cancer, legitimately fears that his long term health is being jeopardized by the lack of appropriate medical care he continues to receive in ICE custody. In the short term, Mr.

Castaneda continues to experience severe pain, bleeding, and discharge." (*Id.*) The letter requested medical treatment for Castaneda.

Also on December 5, a TAR was filed seeking consultation with Lawrence Greenburg, M.D., because of a "history of severe HPV infection causing large, painful, penile warts, has bleeding and pain from the lesions. May also have an underlying structural deformity of penis." (Doyle Decl. Ex. 31.) Dr. Greenberg "also recommended a circumcision and biopsy." (Jawetz Decl. Ex. 5.) On January 19, an ACLU attorney faxed another letter to ICE, requesting medical treatment for Castaneda. (*Id.*) On January 24, a TAR for a urology consult with Asghar Askari, M.D. was approved. (Doyle Decl. Ex. 32.) The next day, Castaneda was seen by Dr. Askari, who diagnosed a fungating penile lesion that was "most likely penile cancer" and ordered a biopsy. (*Id.* Ex. 33.)

On January 29, 2007, the ACLU faxed yet another letter to ICE, urging the agency to provide Castaneda the care that had been ordered for the past ten months. (Jawetz Decl. Ex. 6.) According to Plaintiff's complaint, a biopsy was finally scheduled for early February. However, a few days before the procedure, Castaneda was abruptly released from ICE custody. Castaneda then went to the ER of Harbor–UCLA Hospital in Los Angeles on February 8, 2007, where he was diagnosed with squamous cell carcinoma. His penis was amputated on Valentines Day, 2007. According to the complaint, Harbor–UCLA confirmed that Castaneda had metastatic cancer. Castaneda began undergoing chemotherapy at Harbor–UCLA. (Amended Compl. ¶¶ 104–09.) However, the treatment was not successful, and on February 16, 2008, Mr. Castaneda died.[6]

---

6. A motion to substitute the representative and heirs of his estate as the proper parties, as well as to permit the filing of a second amended complaint, is currently pending before the Court. However, this motion does

Plaintiff Castaneda brings this lawsuit against, *inter alia*, the United States and individual federal officials, arguing that the refusal to provide Castaneda with a biopsy despite numerous medical orders to do so violated the United States Constitution.[7] Plaintiff brings state tort claims against the United States under the Federal Torts Claims Act ("FTCA"),[8] and alleges federal constitutional violations against the individuals pursuant to *Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (establishing that victims of a constitutional violation by a federal agent may recover damages against that federal official in federal court).

The individual Public Health Service ("PHS") Defendants now bring this motion to dismiss for lack of subject matter jurisdiction.[9] They argue that the PHS Defendants are absolutely immune from suit, that Plaintiff must instead bring this claim as an FTCA action against the United States, and that because the United States has not waived sovereign immunity for claims of constitutional violations, this action must be dismissed.

## III. DISCUSSION

This case presents an unresolved legal question in the Ninth Circuit: whether § 233(a) of the Public Health Service Act allows Castaneda to assert *Bivens* claims

against the individual Public Health Service Defendants. The Court finds that the plain language of the statute dictates that it does.[10]

### A. *Bivens* Claims are Generally Available to Remedy Eighth Amendment Violations, and the FTCA is Intended as a Parallel, Rather Than a Substitute Remedy

■ A victim of a constitutional violation by a federal agent may bring a *Bivens* action to recover damages against the individual in his personal capacity unless "defendants demonstrate special factors counseling hesitation in the absence of affirmative action by Congress" or unless "defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson v. Green*, 446 U.S. 14, 18–19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (internal quotation marks omitted). The only question before the Court is whether Congress has explicitly provided for a substitute remedy under the circumstances in this case, so as to preclude a *Bivens* claim.

The United States Supreme Court has made "crystal clear" that in cases involving Eighth Amendment claims based on an alleged failure to provide proper medi-

---

not affect the instant motion to dismiss, and the individual federal defendants—the moving parties in the instant motion—do not oppose the substitution.

7. Plaintiff also brings claims against California state officials. These claims are not at issue in the instant motion.

8. The FTCA makes the federal government liable to the same extent as a private party for certain torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1).

9. These Defendants are Chris Henneford, Eugene Migliaccio, Timothy Shack, M.D., Esther Hui, M.D., and Stephen Gonsalves.

10. Plaintiff brings a *Bivens* claim alleging a violation of the Fifth Amendment's Equal Protection Clause as well as his Eighth Amendment claim for inadequate medical care. Because Defendants do not specifically argue that Plaintiff's Fifth Amendment claim is also preempted by § 233(a), the Court does not address the issue, except to note that its conclusion that § 233(a) allows an Eighth Amendment *Bivens* claim applies equally to any other *Bivens* claim.

cal care, "Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.* at 20, 100 S.Ct. 1468. In *Carlson*, the Court rejected defendants' argument that the FTCA was intended by Congress to be an adequate substitute:

> [W]e have here no explicit congressional declaration that persons injured by federal officers' violations of the Eighth Amendment may not recover money damages from the agents but must be remitted to another remedy, equally effective in the view of Congress. Petitioners point to nothing in the Federal Tort Claims Act (FTCA) or its legislative history to show that Congress meant to pre-empt a *Bivens* remedy or to create an equally effective remedy for constitutional violations.

*Id.* at 19, 100 S.Ct. 1468.

According to the Court, "[f]our additional factors, each suggesting that the *Bivens* remedy is more effective than the FTCA remedy, also support our conclusion that Congress did not intend to limit [the aggrieved individual] to an FTCA action." *Id.* at 20–21, 100 S.Ct. 1468. First, the threat of a *Bivens* claim provides stronger deterrence against future constitutional violations than an FTCA action because only the former remedy "is recoverable against individuals," and "[i]t is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." *Id.* at 21, 100 S.Ct. 1468 (internal citations omitted).

Second, and relatedly, punitive damages are available in a *Bivens* action, but are "statutorily prohibited" in an FTCA suit, *see* 28 U.S.C. § 2674, so the "FTCA is that much less effective than a *Bivens* action as a deterrent to unconstitutional acts." *Id.* at 22, 100 S.Ct. 1468. Moreover, because 42 U.S.C. § 1983—the counterpart to *Bivens* actions for constitutional violations by state officials—allows for punitive dam-

ages, "the constitutional design would be stood on its head if federal officials did not face at least the same liability as state officials guilty of the same constitutional transgression." *Id.* (internal quotation marks omitted).

Third, *Bivens* actions are more effective in this context because FTCA actions do not allow for jury trials. The Court found "significant[ ]" that plaintiffs should be able to retain the choice between courts and juries. *Id.* Fourth, and finally,

> an action under FTCA exists only if the State in which the alleged misconduct occurred would permit a cause of action for that misconduct to go forward. 28 U.S.C. § 1346(b) (United States liable "in accordance with the law of the place where the act or omission occurred"). Yet it is obvious that the liability of federal officials for violations of citizens' constitutional rights should be governed by uniform rules. . . . The question whether respondent's action for violations by federal officials of federal constitutional rights should be left to the vagaries of the laws of the several States admits of only a negative answer in the absence of a contrary congressional resolution.

*Id.* at 23, 100 S.Ct. 1468. For all of the above reasons, the Court held that "[p]lainly FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy." *Id.*

Since the Court's opinion in *Carlson*, Congress has amended the FTCA to expressly preserve parallel *Bivens* actions against federal employees. In 1988, it passed the Federal Employees Liability and Tort Compensation Act, which, *inter alia*, provided the FTCA will be the "exclusive" remedy "of any other civil action

or proceeding for money damages ... against [a federal] employee." 28 U.S.C. § 2679(b)(1). However, the Act then explains that this exclusivity "does not extend or apply to a civil action against an employee of the Government ... which is brought for a violation of the Constitution of the United States." *Id.* § 2679(b)(2)(A).

## B. Both the Plain Language and the Legislative History of § 233(a) Evince a Congressional Intent to Preserve *Bivens* Actions

■ Defendants acknowledge that in general, victims of constitutional violations may proceed with both FTCA and *Bivens* claims. They nonetheless urge that as to the Public Health Service Defendants specifically, Congress has expressed an explicit intent, through the Public Health Service Act, to limit plaintiffs to an FTCA remedy. The Court disagrees.

■ Whether the Public Health Service Act evinces an intent to limit Mr. Castaneda's remedies against PHS Defendants for any constitutional violations to an FTCA claim is a question of statutory interpretation. When interpreting a statute, courts "look first to the plain language of the statute, construing the provisions of the entire law." *Nw. Forest Resource Council v. Glickman,* 82 F.3d 825, 831 (9th Cir. 1996) (internal quotation marks omitted). After that, "if the language of the statute is unclear, we look to the legislative history." *Id.* (internal quotation marks omitted). In this case, both the text and legislative history reveal an explicit intent to allow *Bivens* claims.

### 1. Plain Language

The pertinent provision of the Public Health Service Act, § 233(a),[11] reads in its entirety as follows:

DEFENSE OF CERTAIN MALPRACTICE AND NEGLIGENCE ACTS

Sec. 223. (a) The remedy against the United States provided by sections 1346(b) and 2672 of title 28 [the FTCA], or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

Emergency Health Personnel Act of 1970, Pub.L. No. 91–623, § 223(a), 84 Stat. 1868, 1870 (1970). From this provision, it is clear that Congress intended *some* medical injuries caused by PHS employees to be redressable solely through the FTCA. The question is whether the provision applies to allegations of constitutional violations. Congress has expressly indicated that it does not.

At first glance, it may appear that § 233(a) does not address one way or another whether Congress intended constitutional claims to come under its rubric. Upon following the statutory trail, howev-

---

11. The language of Public Law No. 91–623 has not been amended since enacted on December 31, 1970. However, the 1970 edition of the United States Code (where this statute first appeared in the Code) renumbered this section as "§ 233(a)." Although the accurate version is § 223(a) of the Public Health Service Act in the Statutes at Large, the Court will refer to the section as § 233(a) for ease of reference.

er, it turns out that Congress has in fact explicitly answered the question presented by this case.

Subsection 233(a) declares that "[t]he remedy against the United States provided by sections 1346(b) and 2672 of title 28, ... shall be exclusive." The two sections mentioned—1346(b) and 2672—are part of the FTCA. The latter—entitled "Administrative Adjustment of Claims"—deals with how a federal agency may manage the claims against it, and is not relevant for our purposes. Subsection 1346(b), however, is more instructive:

> **(b)(1)** *Subject to the provisions of chapter 171 of this title,* the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(emphasis added).

One little clause, almost invisible, should attract our attention: "Subject to the provisions of chapter 171 of this title." This is the kind of clause that is often ignored, on the assumption that it is probably not relevant. But let us see what chapter 171 says, just in case:

**CHAPTER 171—TORT CLAIMS PROCEDURE**

28 USCA Pt. VI, Ch. 171, Refs & Annos

§ 2671. Definitions

§ 2672. Administrative adjustment of claims

§ 2673. Reports to Congress

§ 2674. Liability of United States

§ 2675. Disposition by federal agency as prerequisite; evidence

§ 2676. Judgement as bar

§ 2677. Compromise

§ 2678. Attorney fees; penalty

§ 2679. Exclusiveness of remedy

§ 2680. Exceptions

The statutory provision that is the central focus of this motion to dismiss—§ 233(a)—thus explicitly incorporates by reference 28 U.S.C. § 2679. Subsection 2679(b) is dispositive here:

> **(b)(1)** The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.
>
> **(2)** *Paragraph (1) does not extend or apply to a civil action against an employee of the Government—*
>
> *(A) which is brought for a violation of the Constitution of the United States.*

28 U.S.C. § 2679 (emphasis added). Therefore, § 233(a) incorporates the provision of the FTCA which *explicitly* preserves a plaintiff's right to bring a *Bivens* action. Stated differently, far from evincing the explicit intent required by *Carlson*

that Congress intended to preclude *Bivens* claims, the plain language of § 233(a) unambiguously states the opposite:

> The [exclusive] remedy against the United States provided by sections 1346(b) and 2672 of title 28 ... for damage for personal injury, including death, resulting from the performance of medical ... or related functions ... by any commissioned officer or employee of the Public Health Service ... does not extend or apply to a civil action ... which is brought for a violation of the Constitution of the United States.

42 U.S.C. § 233(a); 28 U.S.C. § 2679(b).

The United States Supreme Court, in interpreting a provision similar to § 233(a), has confirmed that the "the FTCA is not the exclusive remedy for torts committed by Government employees in the scope of their employment when an injured plaintiff brings: (1) a *Bivens* action." *United States v. Smith*, 499 U.S. 160, 166–67, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991); *see also Billings v. United States*, 57 F.3d 797, 800 (9th Cir.1995) (noting that "constitutional claims are outside the purview of the Federal Tort Claims Act"). *Smith* dealt with the Gonzales Act, which has a provision worded almost identically to § 233(a):

> **§ 1089. Defense of certain suits arising out of medical malpractice**
>
> **(a)** The remedy against the United States provided by sections 1346(b) and 2672 of title 28 for damages for personal injury, including death, caused by the negligent or wrongful act or omission of any physician, dentist, nurse, pharmacist, or paramedical or other supporting personnel (including medical and dental technicians, nursing assistants, and therapists) of the armed forces, the National Guard while engaged in training or duty ..., the Department of Defense, the Armed Forces Retirement Home, or the Central Intelligence Agency in the performance of medical, dental, or related health care functions (including clinical studies and investigations) while acting within the scope of his duties or employment therein or therefor shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against such physician, dentist, nurse, pharmacist, or paramedical or other supporting personnel (or the estate of such person) whose act or omission gave rise to such action or proceeding. This subsection shall also apply if the physician, dentist, nurse, pharmacist, or paramedical or other supporting personnel (or the estate of such person) involved is serving under a personal services contract entered into under section 1091 of this title.

10 U.S.C. § 1089(a). Both § 1089(a) and § 233(a) address claims for "damage for personal injury, including death" which result from certain federal officials involved in the "performance of medical, dental, or related health functions." Both subsections incorporate by reference 28 U.S.C. §§ 1346 and 2672 of the FTCA, and explain that the remedy provided by those subsections "shall be exclusive of any other civil action or proceeding by reason of the same subject matter." The Supreme Court has acknowledged the FTCA's "express preservation of employee liability" for *Bivens* claims in the context of 10 U.S.C. § 1089. *Smith*, 499 U.S. at 166–67, 111 S.Ct. 1180. Like 10 U.S.C. § 1089, § 233(a) of the Public Health Service Act incorporates the FTCA as an exclusive remedy, and like 10 U.S.C. § 1089, § 233(a) incorporates that remedy's express preservation of employee liability for *Bivens* claims.

Defendants rely heavily upon the Second Circuit's opinion in *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir.2000), which held that the plain language of § 233(a) precluded *Bivens* actions. Although *Cuoco*

cites § 233(a), and its incorporation of the FTCA remedy, it appears that the court, for whatever reason, was not aware of what the FTCA remedy in fact consisted. If the Second Circuit had followed the statutory trail back to 28 U.S.C. § 2679, this Court can only opine that *Cuoco* would have adhered to the statutory mandate preserving *Bivens* claims. This Court therefore respectfully requests that the Second Circuit, as well as the several other courts that have followed *Cuoco*, reconsider their holdings. *See, e.g., Anderson v. Bureau of Prisons,* 176 Fed.Appx. 242, 243 (3d Cir.2006) (unpublished); *Lyons v. United States,* No. 4:03CV1620, 2008 WL 141576, at *12 n. 5 (Jan. 11, 2008) (unpublished); *Lee v. Guavara,* C/A/ No. 9:06–1947, 2007 WL 2792183, at *14 (D.S.C. Sept. 24, 2007) (unpublished); *Fourstar v. Vidrine,* No. 1:06–cv–916, 2007 WL 2781894, at *4 (S.D.Ind. Sept. 21, 2007); *Hodge v. United States,* No. 3:06cv1622, 2007 WL 2571938, at *4–5 (M.D.Pa. Aug. 31, 2007) (unpublished); *Coley v. Sulayman,* Civ. Action No. 06–3762, 2007 WL 2306726, at *4–5 (D.N.J. Aug. 7, 2007) (unpublished); *Wallace v. Dawson,* No. 9:05CV1086, 2007 WL 274757, at *4 (N.D.N.Y. Jan. 29, 2007) (unpublished); *Barbaro v. U.S.A.,* No. 05 Civ. 6998, 2006 WL 3161647, at *1 (S.D.N.Y. Oct. 30, 2006) (unpublished); *Williams v. Stepp,* No. 03–cv–0824, 2006 WL 2724917, at *3–4 (S.D.Ill. Sept. 21, 2006) (unpublished); *Cuco v. Fed. Medical Center–Lexington,* No. 05–CV–232, 2006 WL 1635668, at *20 (E.D.Ky. June 9, 2006) (unpublished); *Arrington v. Inch,* No. 1:05–CV–0245, 2006 WL 860961, at *5 (M.D.Pa. March 30, 2006) (unpublished); *Foreman v. Fed. Corr. Inst.,* No. CIV A 504–CV–01260, 2006 WL 4537211, at *8 (S.D.W.Va. March 29, 2006) (unpublished); *Pimentel v. Deboo,* 411 F.Supp.2d 118, 126–27 (D.Conn. 2006); *Whooten v. Bussanich,* No. Civ. 4:CV–04–223, 2005 WL 2130016, at *3 (M.D.Pa. Sept. 2, 2005) (unpublished); *Freeman v. Inch,* No. 3:04–CV–1546, 2005 WL 1154407, at *2 (M.D.Pa. May 16, 2005) (unpublished); *Dawson v. Williams,* No. 04 Civ. 1834, 2005 WL 475587, at *8 (S.D.N.Y. Feb. 28, 2005) (unpublished); *Lovell v. Cayuga Corr. Facility,* No. 02–CV–6640L, 2004 WL 2202624, at *2 (W.D.N.Y. Sept. 29, 2004) (unpublished); *Valdivia v. Hannefed,* No. 02–CV–0424, 2004 WL 1811398, at *4 (W.D.N.Y. Aug. 10, 2004) (unpublished); *Cook v. Blair,* No. 5:02–CT–609, 2003 WL 23857310, at *1 (E.D.N.C. March 21, 2003) (unpublished); *Brown v. McElroy,* 160 F.Supp.2d 699, 703 (S.D.N.Y.2001).

The Supreme Court did not rely in *Carlson* on the express FTCA language preserving *Bivens* remedies because that language was added to the FTCA in 1988—eight years after *Carlson*—as part of the Federal Employees Liability Reform and Tort Compensation Act. In effect, the 1988 amendment codified the holding in *Carlson* and made explicit the fact that Congress did not intend for the FTCA to preempt *Bivens* claims. Therefore, any ambiguity that may have existed prior to the 1988 amendment has long been extinguished. Frankly, the Court is surprised that neither the parties in this case, nor the Second Circuit in *Cuoco*, nor the many courts that have followed *Cuoco* without analysis, have noticed that the FTCA explicitly preserves the right to bring *Bivens* claims. Therefore, according to the plain text of § 233(a), Public Health Service officials are immune from suit under the circumstances provided by the FTCA, which does not include claims for constitutional violations; the PHS Defendants are therefore not entitled to immunity in this case.

**2. Legislative History**

The plain text ends the inquiry. The Court is compelled to follow the direct expression of intent in § 233(a). Period.

*Cf. U.S. ex rel. Lujan v. Hughes Aircraft Co.,* 243 F.3d 1181, 1187 (9th Cir.2001) ("If the statute is ambiguous, we consider the legislative history."). It is useful nevertheless to note that the legislative history in this case is equally direct. The relevant materials provide context for what Congress envisioned by preserving *Bivens* claims, and make clear that not only did Congress intend to preserve the *Bivens* remedy, but it intended to do so specifically in the context of § 233(a).

**a. Congress Intended to Preserve *Bivens* Because of the Difference Between Claims for Malpractice and Claims for Constitutional Violations**

■ A 1988 House Committee Report of the 1988 amendment to the FTCA stated the following:

> The second major feature of section 5 [codified at 28 U.S.C. § 2679(b)(2)(A) ] is that the exclusive remedy expressly does not extend to so-called constitutional torts. See *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 [91 S.Ct. 1999, 29 L.Ed.2d 619] (1971). Courts have drawn a sharp distinction between common law torts and constitutional or *Bivens* torts. Common law torts are the routine acts or omissions which occur daily in the course of business and which have been redressed in an evolving manner by courts for, at least, the last 800 years.... As used in H.R. 4612, the term 'common law tort' embraces not only those state law causes of action predicated on the 'common' or case law of the various states, but also encompasses traditional tort causes of action codified in state statutes that permit recovery for acts of negligence. A good example of such codification or tort causes of action are state wrongful death actions which are predominantly found upon state wrongful death stat-

utes. It is well established that the FTCA applies to such codified torts. See, e.g., *Richards v. United States,* 369 U.S. 1, 6–7 [82 S.Ct. 585, 7 L.Ed.2d 492] (1962); *Proud v. United States,* 723 F.2d 705, 706–07 (9th Cir.1984), cert. denied, 467 U.S. 1252 [104 S.Ct. 3536, 82 L.Ed.2d 841] (1984) applicability of recreational use statute). A constitutional tort action, on the other hand, is a vehicle by which an individual may redress an alleged violation of one or more fundamental rights embraced in the Constitution. Since the Supreme Court's decision in *Bivens, supra,* the courts have identified this type of tort as a more serious intrusion of the rights of an individual that merits special attention. Consequently, H.R. 4612 *would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights.*

H.R. Rep. 100–700 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5950 (emphasis added). Thus, Congress could not have been clearer that 28 U.S.C. § 2679, which is incorporated by reference into § 233(a), was intended to *preserve,* not preclude, *Bivens* actions to redress constitutional violations. This congressional statement is particularly persuasive because, as legislative history goes, committee reports are given great weight. *See Abrego Abrego v. The Dow Chemical Co.,* 443 F.3d 676, 687 (9th Cir.2006).

■ It is not surprising that Congress, in preserving *Bivens* liability, emphasized the difference between constitutional torts and garden-variety malpractice claims, for the distinction is longstanding and important. To establish an Eighth Amendment violation for inadequate medical care a plaintiff must show "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97,

104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Such deliberate indifference may "manifest[ ]" itself through the intentional denial or delay of care or an intentional interference "with the treatment once prescribed." *Id.* at 104–05, 97 S.Ct. 285. However, neither an accident, an "inadvertent failure to provide adequate medical care," nor "negligen[ce] in diagnosing or treating a medical condition," though each may be medical malpractice, is cognizable as a federal constitutional claim. *Id.* at 105–06, 97 S.Ct. 285. In short, a constitutional violation is an intentional tort—a higher standard than a negligence suit for medical malpractice based on a personal injury.

■ Even the legislative history from § 233(a) itself—expressed eighteen years before Congress would amend the FTCA to explicitly preserve *Bivens* claims—reveals that Congress intended by § 233(a) to immunize PHS employees from garden-variety malpractice claims, not from constitutional violations.[12]

The provision in question was not a part of the original Public Health Service Act; rather, it was introduced as an amendment in the House during a congressional debate on December 18, 1970. Representative Staggers, who introduced the amendment, stated that the House "ought to" adopt the amendment so that, "in the event there is a suit against a PHS doctor *alleging malpractice,* the Attorney General of the United States would defend them in whatever suit may arise." 91 Cong. Rec. H42542–32 (daily ed. Dec. 18, 1970) (emphasis added). Representative Staggers emphasized that the amendment was "needed because of the low salaries that [PHS doctors] receive and in view of their

---

12. To the extent that § 233(a) is at all ambiguous (which it is not) as to whether it immunizes PHS employees from constitutional as well as malpractice claims, the title of the statutory subsection supports the Court's conclusion. *See Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947) (noting that "the title of a statute and the heading of a section" may be used "[f]or interpretive purposes ... when they shed light on some ambiguous word or phrase"). In this case, the title of the relevant section, "DEFENSE OF CERTAIN MALPRACTICE AND NEGLIGENCE ACTS," clearly indicates that Congress, even before it amended the FTCA expressly to preserve *Bivens* claims, intended § 233(a) to apply to malpractice and negligence actions specifically. Far from suggesting that the subsection covers constitutional claims, then, the title shows that Congress meant by this section to offer immunity for certain specific claims, and that those claims did not include intentional (constitutional) torts.

When the statute was codified in the United States Code at 42 U.S.C. § 233(a), the title of the subsection was changed—without any congressional amendment—from "DEFENSE OF CERTAIN MALPRACTICE AND NEGLIGENCE ACTS" to "Exclusiveness of Remedy." *Compare* Emergency Health Personnel Act of 1970, Pub.L. No. 91–623, § 223(a), 84 Stat. 1868, 1870 (1970) *with* 42 U.S.C. § 233(a)(1970). To the extent that the subsection is ambiguous, its title affects its meaning. In the context of "DEFENSE OF CERTAIN MALPRACTICE AND NEGLIGENCE ACTS," the grant of immunity obviously refers to malpractice and negligence actions; by contrast, in the context of "Exclusiveness of Remedy," the text could apply in a much broader fashion.

Nevertheless, there is no doubt about which version the Court must follow. "Though the appearance of a provision in the current edition of the United States Code is 'prima facie' evidence that the provision has the force of law, ... it is the Statutes at Large that provides the 'legal evidence of laws.'" *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 449, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). As "the Code cannot prevail over the Statutes at Large when the two are inconsistent," *United States v. Welden,* 377 U.S. 95, 98 n. 4, 84 S.Ct. 1082, 12 L.Ed.2d 152 (1964), the Court will consider only the original version entitled "DEFENSE OF CERTAIN MALPRACTICE AND NEGLIGENCE ACTS," and with it that title's effect on the scope of the provision.

low salaries, they cannot afford to take out the insurance to cover them in the *ordinary course of their practice of medicine.*" *Id.* (emphasis added). Representative Hall supported the amendment but urged the committee to "look[ ] into the general problem in the United States of malpractice insurance." *Id.* The House approved the amendment. In context, then, the amendment obviously stemmed from concerns over liability for unintentional malpractice, *not* from attempts to avoid responsibility for the kind of intentional torts that would support a constitutional violation.

The only mention of the amendment in the Senate occurred three days later, when Senator Javitz expressed his support for "the provision for the defense of certain malpractice and negligence suits" which would protect doctors "in the event there is a suit against a PHS doctor alleging malpractice." 91 Cong. Rec. S42977 (daily ed. Dec. 21, 1970). Aside from these instances, the amendment, as far as the Court can tell, was never mentioned. Thus, even before the 1988 FTCA amendment, far from revealing an intent to immunize PHS doctors from intentional torts, the legislative history of § 233(a) shows that the amendment was clearly intended to protect PHS doctors from ordinary medical malpractice actions.[13]

### b. Congress Intended to Preserve *Bivens* in the Specific Context of § 233(a)

The legislative history of the 1988 amendment to the FTCA reveals not only that Congress intended to preserve *Bivens* claims, but that it so intended specifically with respect to § 233(a). Some statutory context is in order.

This 1988 FTCA amendment—28 U.S.C. § 2679—renders the FTCA the exclusive remedy for all civil actions (except, *inter alia, Bivens* claims) against all federal employees. The legislative history to 28 U.S.C. § 2679 explains that the intention of the provision was to "remove the potential personal liability of Federal employees for common law torts committed within the scope of their employment, and would instead provide that the exclusive remedy for such torts is through an action against the United States under the Federal Tort Claims Act." H.R. Rep. 100–700, 1988 U.S.C.C.A.N., at 5947. In the same House Report in which it articulated its reasons for preserving *Bivens* actions, Congress explained that it felt comfortable awarding such a broad swath of immunity because

"[t]here is substantial precedent for providing an exclusive remedy against the United States for actions of Federal employees. Such an exclusive remedy has already been enacted to cover the activities of certain Federal employees, including: ... 42 U.S.C. 233 regarding Public Health Service Physicians."

*Id.* at 5948. In other words, 28 U.S.C. § 2679 provided the same immunity as § 233(a), but extended that immunity to all federal employees. After the 1988 passage of 28 U.S.C. § 2679, all federal employees—not just certain specified federal employees such as PHS officials—are covered. *See Smith,* 499 U.S. at 172–73, 111 S.Ct. 1180 (holding that the Federal Employees Liability Reform and Tort Compensation Act, including § 2679, applies

---

13. Such a distinction makes sense. Protecting low-paid Public Health Service doctors from astronomical malpractice insurance premiums due to run-of-the-mill personal injury claims is a reasonable, practical endeavor. Protecting individuals who intentionally inflict cruel and unusual punishment just be-

cause they happen to work for the Public Health Service is not. Would an individual who purposefully subjected a patient to surgery without anesthesia deserve immunity? A civilized society can answer this question only in the negative.

both to "employees who are covered under pre-Act immunity statutes [such as § 233(a)] and those who are not," and noting that this immunity is limited by the "preserv[ation] of employee liability for *Bivens* actions").

Congress was aware of § 233(a) when it expanded immunity to all federal employees. Indeed, provisions like § 233(a) provided the example and incentive to so broaden that immunity. At the same time, Congress made clear that this immunity was intended to cover "routine" torts, and that a plaintiff whose constitutional rights had been violated remained free to pursue a *Bivens* claim against the individual federal employee in question. H.R. Rep. 100–700, 1988 U.S.C.C.A.N., at 5947. In light of the explicit statutory text and legislative history, there can be no doubt that the FTCA—and § 233(a), which incorporates the FTCA's remedies by reference—expressly allows for the *Bivens* claim that Mr. Castaneda seeks to bring in this case.

## C. Plaintiff's Allegations and Evidence, if True, Prove Constitutional Violations

■ Ultimately, Defendants concede that an Eighth Amendment claim for unconstitutionally-inadequate medical care is not subsumed by a claim for medical malpractice; instead, they urge that Plaintiff's claims just don't make the constitutional cut, so to speak. As Defendants put it, "[t]he bottom line is that Plaintiff's claims form the basis for a medical malpractice action (a non-constitutional tort claim) against the United States, and not a *Bivens* claim against each Public Health Service Defendant." (Mot. 8.) Defendants acknowledge that Plaintiff's complaint alleges that the Public Health Service Defendants " 'purposefully denied him basic and humane medical care for illegal and improper reasons,' " but posit that "[t]his vague and conclusory allegation fails to state any civil rights violation." (*Id.* 6.

(quoting Compl.).) The Court rejects Defendants' attempt to sidestep responsibility for what appears to be, if the evidence holds up, one of the most, if not the most, egregious Eighth Amendment violations the Court has ever encountered.

There simply can be no dispute that Plaintiff has stated a cognizable claim for an Eighth Amendment violation. Mr. Castaneda quite obviously suffered from a serious medical condition—terminal penile cancer. The only question is whether his allegations, if true, show that Defendants were deliberately indifferent to his condition. The Court finds that they do.

Indeed, the Court finds perplexing the fact that Defendants would try to argue that Plaintiff's allegations are conclusory, given that Plaintiff has submitted thirty-three exhibits of Defendants' own official medical records documenting their knowledge of the fact that several physicians had concluded that Plaintiff's lesion was very likely penile cancer, and that he needed a biopsy—a straightforward procedure—to rule cancer out. These documents show that nevertheless, Defendants refused to grant Plaintiff this simple procedure for almost eleven months, even while they noted that his pain and suffering were severe and increasing, that his penis was emitting blood and discharge, and that a second growth had developed.

Therefore, if Plaintiff's evidence proves true, from the first time Castaneda presented with a suspicious lesion in March 2006 through his release in February 2007, the care afforded him by Defendants can be characterized by one word: nothing. The evidence that Plaintiff has already produced at this early stage in the litigation is more thorough and compelling than the complete evidence compiled in some meritorious Eighth Amendment actions. Defendants will surely have an opportunity to contest or refute the evidence present-

ed. But their assertion that Plaintiff's claim is not even cognizable is, frankly, frivolous.

## D. FTCA Remedy is Not Equally Effective as a *Bivens* Action

The circumstances of this case illustrate why, as the Supreme Court concluded in *Carlson*, FTCA claims against the United States are not as effective a remedy as a *Bivens* claim against individual federal officials. First, and most importantly, as Defendants acknowledge, Plaintiff Castaneda may not bring his constitutional claims for inadequate medical care against the United States under the FTCA because the United States has not waived sovereign immunity to be sued for constitutional torts. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 478–480, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). It would turn logic on its head to hold that the FTCA is an "equally effective" remedy for constitutional violations as a *Bivens* action, *Carlson*, 446 U.S. at 19, 100 S.Ct. 1468, when suits under the FTCA do not even *allow* for constitutional claims. *See Vaccaro v. Dobre*, 81 F.3d 854, 857 (9th Cir.1996) (holding that prisoner plaintiff did not have to serve the United States as a defendant in his *Bivens* claim for inadequate medical care "[b]ecause [plaintiff] did not and could not have sued the United States or its officers in their official capacity upon a *Bivens* claim").[14]

Indeed, Defendants' contorted reasoning is revealed by its request for relief in this motion: Defendants ask this Court to hold that Congress, through § 233(a), intended the FTCA to be the exclusive cause of action for Castaneda's constitutional claims, and then, having thus converted the claim to an FTCA action against the United States, Defendants seek dismissal on the grounds that the United States may not be sued for constitutional torts under the FTCA. The Court will not indulge this backwards argument.

Second, an FTCA action is only allowed to the extent it would be allowed under state law. 28 U.S.C. § 1346(b). California caps non-economic damages in medical malpractice actions at $250,000. *See* Cal. Civ. Code § 3333.2. In contrast, there is no cap on damages in *Bivens* actions. Plain-

---

14. Defendants rely primarily on the Second Circuit's decision in *Cuoco v. Moritsugu*, 222 F.3d 99 (2d Cir.2000), for the proposition that § 233(a) was intended by Congress to preclude *Bivens* actions. For several reasons, the Court does not find this non-binding authority persuasive. First, and most importantly, the court in *Cuoco* did not recognize that § 233(a) explicitly incorporates by reference the FTCA remedy codified at 28 U.S.C. § 2679, which, as discussed, expressly preserves the right to bring *Bivens* claims. Second, and relatedly, *Cuoco* does not address whether Congress viewed the FTCA as being equally effective as a *Bivens* action. The Supreme Court has held that this threshold issue must be established before declaring the FTCA an exclusive remedy at the expense of a *Bivens* claim. *See Carlson*, 446 U.S. at 18–19, 100 S.Ct. 1468. Yet, *Cuoco* never makes this finding, nor does the opinion analyze the four factors set forth in *Carlson* that explain why remedies under the FTCA and *Bivens* are not equally effective. 222 F.3d at 107–09. Third, *Cuoco* does not adequately examine the differences between a state law medical negligence claim under the FTCA and a constitutional claim under *Bivens*. On the one hand, *Cuoco* states: "Of course Congress could not, by the simple expedient of enacting a statute, deprive Cuoco of her constitutional due process rights, but that is not what § 233(a) does." *Id.* at 108. In the next sentence, however, *Cuoco* asserts that § 233(a) "protects commissioned officers or employees of the Public Health Service from being subject to suit while performing medical and similar functions by requiring that such lawsuits be brought against the United States instead." *Id.* This analysis overlooks the important fact that, as discussed, the United States cannot be sued for constitutional violations. Therefore, *Cuoco's* construction of § 233(a) does exactly what it claims it cannot do: deprive a plaintiff of a constitutional claim by relegating him to an action under the FTCA.

tiff has a strong argument that $250,000 would be inadequate to compensate his "ten months of pain, bleeding, anxiety, loss of sleep, and humiliation while in ICE's custody, the amputation of his penis, and nearly a year of grueling chemotherapy," not to mention his eventual death. (Opp'n 19.)

Third, FTCA actions, unlike *Bivens* claims, preclude punitive damages. Yet the evidence that Plaintiff has presented thus far—through Defendants' own records—suggests a strong case for punitive damages because it shows that Defendants' behavior was both callous and misleading. The evidence suggests that they refused Castaneda's request for a biopsy despite their knowledge that several medical specialists suspected cancer and "strongly recommended" a biopsy to rule out that possibility. (Doyle Decl. Ex. 11.) Worse, the evidence suggests that not only did the individual Public Health Service Defendants ignore doctor recommendations to provide Castaneda with a simple procedure, they may also have lied about those recommendations.

For example, Defendant Esther Hui, M.D. stated in an official report that Dr. Wilkinson considered a biopsy or circumcision for Mr. Castaneda to be "elective." (*Id.* Ex. 5) ("Dr. Wilkinson called" and recommended a biopsy, which is "an elective outpatient procedure"). Similarly, another official DIHS report, written by Anthony Walker, claimed that "Dr. Masters stated that elective procedures this patient may need in the future are cytosco-

py and circumcision." (*Id.* Ex. 20.) Yet the reports of Dr. Masters and Dr. Wilkinson never mention the word "elective." On the contrary, Dr. Wilkinson worried that the lesion "may represent . . . a penile cancer" and "require[d] urgent urologic assessment of biopsy" because "even benign lesions" in that area can be deadly. (*Id.* Ex. 4.) Dr. Masters stated the need to "rule out malignant neoplasm" and that "appropriate treatment would be circumcision [and] . . . a biopsy." (*Id.* Ex. 19.)

Further, Dr. Hui and the DIHS included this false characterization in official reports despite the fact that a TAR recognized that both doctors "strongly recommend admission, urology consultation, surgical intervention via biopsy," and despite that fact that Dr. Wilkinson reported that he had spoken to "the physicians at the correctional facility" and "[t]hey understand the need for urgent diagnosis and treatment." (*Id.* Ex. 11, 4.) Indeed, Dr. Hui herself recognized in a report that Castaneda might have cancer but "[s]ince this is an elective outpatient procedure, we decided that we would not admit him [to the hospital to have the procedure] at this time." (*Id.* Ex. 5.)

Plaintiff's evidence also suggests why Dr. Hui was so interested in characterizing the surgery as elective; "as such the Federal Government will not provide for such surgery." [15] (*Id.* Ex. 17.) Plaintiff has thus submitted compelling evidence that Defendants purposefully mischaracterized Plaintiff's medical conditions as elective in

**15.** The Court has serious questions as to the constitutionality of a policy of refusing to pay for all medical treatment that can be characterized as "elective" because, as evidenced by this case, the label fails to identify accurately who needs care. *See, e.g., Brock v. Wright,* 315 F.3d 158, 164 n. 3 (2d Cir.2003) ("Merely because a condition might be characterized as 'cosmetic' does not mean that its seriousness should not be analyzed using the kind of

factors" employed in normal Eighth Amendment jurisprudence). DIHS labeled the treatment in this case "elective" even while acknowledging that Castaneda's condition was so "severe" that he would need a "resection"—full or partial removal of the penis. (Doyle Decl. Ex. 14.) Indeed, Plaintiff's evidence suggests that Dr. Hui defined "elective" so broadly that she believes the term to encompass life-saving treatment.

order to refuse him care. Dr. Wilkinson reported that Defendants refused to admit Castaneda to the hospital for a biopsy because they wanted a "more cost effective" treatment. (*Id.* Ex. 4.) Official records document Defendants' circular logic that because they would not allow him to have the biopsy, "he DOES NOT have cancer at this time"; because he does not have cancer, he therefore does not need a biopsy. (*Id.* Ex. 8.) In other words, as long as they could label Castaneda's condition elective, Defendants could remain willfully blind about his lesion and avoid having to pay for its treatment. If Plaintiff's evidence holds up, the conduct that he has established on the part of Defendants is beyond cruel and unusual.[16]

## IV. CONCLUSION

Based on the foregoing analysis, motion to dismiss is DENIED.

IT IS SO ORDERED.

---

16. After all, Plaintiff has submitted powerful evidence that Defendants knew Castaneda needed a biopsy to rule out cancer, falsely stated that his doctors called the biopsy "elective", and let him suffer in extreme pain for almost one year while telling him to be "patient" and treating him with Ibuprofen, antihistamines, and extra pairs of boxer shorts. Everyone knows cancer is often deadly. Everyone knows that early diagnosis and treatment often saves lives. Everyone knows that if you deny someone the opportunity for an early diagnosis and treatment, you may be—literally—killing the person. Defendants' own records bespeak of conduct that transcends negligence by miles. It bespeaks of conduct that, if true, should be taught to every law student as conduct for which the moniker "cruel" is inadequate.