**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YANIRA CASTANEDA, as personal
representative of Estate of
Francisco Castaneda; VANESSA
CASTANEDA, as heir and beneficiary
of the Estate, by and through her
mother and Guardian Ad Litem
Lucia Pelayo,
          *Plaintiffs-Appellees,*

                    v.

UNITED STATES OF AMERICA;
GEORGE MOLINAR, in his individual
capacity; CLAUDIA MAZUR, in her
individual capacity; DANIEL
HUNTING, M.D.; S. PASHA, in his/
her individual capacity; M.
SHERIDAN, in his/her individual
capacity,
                    *Defendants,*

                   and

CHRIS HENNEFORD, in his individual
capacity; GENE MIGLIACCIO, in his
individual capacity; TIMOTHY
SHACK, M.D. in his individual
capacity; ESTHER HUI, M.D., in her
individual capacity; STEPHEN
GONSALVES, in his individual
capacity,
          *Defendants-Appellants.*

No. 08-55684

D.C. No.
2:07-cv-07241-
DDP-JC

OPINION

13983

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
August 15, 200—Pasadena, California

Filed October 2, 2008

Before: Stephen Reinhardt, Marsha S. Berzon, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**COUNSEL**

John K. Rubiner, Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C., Los Angeles, California; Matthew S. Freedus and Robert Graham, Feldesman Tucker Leifer Fidell LLP, Washington, D.C., for the defendants-appellants.

Adele P. Kimmel, Public Justice, P.C., Washington, D.C.; Conal Doyle, Willoughby Doyle LLP, Oakland, California, for the plaintiffs-appellees.

Jeffrey Clair, United States Department of Justice, Civil Division, Washington, D.C., for the amicus.

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

This appeal requires us to decide whether 42 U.S.C. § 233(a) establishes the Federal Tort Claims Act (FTCA) as the exclusive remedy for constitutional violations committed

by officers and employees of the Public Health Service (PHS), precluding the cause of action recognized in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). We hold that it does not.

## Factual and Procedural Background[1]

### A.   Factual Background

Decedent Francisco Castaneda was imprisoned by the State of California following a December 6, 2005 criminal conviction and held in the custody of the California Department of Corrections (DOC) until his early release date, March 26, 2006. Several times during his approximately three-and-a-half-month incarceration, Castaneda met with DOC medical personnel regarding a white-and-yellow raised lesion, then measuring approximately two centimeters square, on the foreskin of his penis. Twice, in late December and late February, DOC medical providers recommended that Castaneda be referred to a urologist, and that he undergo a biopsy to rule out the possibility of squamous cell cancer. This referral never occurred during Castaneda's detention by DOC, and on March 27, Castaneda was transferred to the custody of Immigration and Customs Enforcement (ICE) at the San Diego Correctional Facility (SDCF).

Immediately upon his transfer, Castaneda brought his condition to the attention of the SDCF medical personnel, members of the Division of Immigration Health Services (DIHS).[2]

---

[1] All facts, unless otherwise indicated, are drawn from Plaintiffs' Third Amended Complaint. On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), we assume the truth of all allegations in the complaint. *Savage v. Glendale Union High Sch., Dist. No. 205*, 343 F.3d 1036, 1039 n.1 (9th Cir. 2003).

[2] DIHS, a division of the Department of Health and Human Services, "is responsible for provision of direct primary health care at all ICE Service Processing Centers and selected contract detention facilities throughout the Nation." Statement of Organization, Functions and Delegations of Authority, 69 Fed. Reg. 56,433, 56,436 (Sept. 21, 2004).

By this time, the lesion on his penis had become painful, growing in size, bleeding, and exuding discharge. Castaneda met with PHS physician's assistant Lieutenant Anthony Walker,[3] who recommended a urology consult and a biopsy "ASAP," noting both Castaneda's history of genital warts and his family history of cancer (his mother died at age 39 of pancreatic cancer). That consultation with an outside urologist, John R. Wilkinson, M.D., did not occur until June 7, 2006. Dr. Wilkinson "agree[d] that" Castaneda's symptoms "require[d] urgent urologic assessment of biopsy and definitive treatment," citing the potential for "considerable morbidity from even benign lesions which are not promptly and appropriately treated." Although Dr. Wilkinson's notes indicate that he "offered to admit [Castaneda] for a urologic consultation and biopsy," DIHS physicians indicated their "wish to pursue outpatient biopsy which would be more cost effective." That biopsy, however, did not occur. Instead, Plaintiffs allege that DIHS officials deemed the biopsy, a standard diagnostic procedure to detect a life-threatening disease,[4] to be an "elective outpatient procedure" and declined to approve it.

---

[3]The Public Health Service is one of the seven uniformed services of the United States. 42 U.S.C. § 201(p). Organized along military lines, the PHS is staffed by commissioned officers who maintain a statutorily defined military rank equivalent. 42 U.S.C. § 207. Although the statute defines PHS rank by equivalent U.S. Army rank (from Second Lieutenant to Major General for the Surgeon General), *id.*, PHS commissioned officers are referred to by their equivalent U.S. Navy rank (from Ensign to Vice Admiral for the Surgeon General), and wear the corresponding Navy uniform and insignia. *See* U.S. Public Health Service Commissioned Corps, U.S. Dep't of Health & Human Serv., *About the Commissioned Corps: Uniforms* (June 24, 2008), http://www.usphs.gov/AboutUs/uniforms.aspx (last accessed August 18, 2008). Although ordinarily a part of the Department of Health and Human Services, the PHS, like the Coast Guard, may be called into military service in times of war or national emergency, whereupon its personnel become subject to the Uniform Code of Military Justice. 42 U.S.C. § 217.

[4]In 2008, an estimated 1250 men in the United States will develop penile cancer and 290 men will die of it. Am. Cancer Soc'y, *Cancer Facts & Figures: 2008*, *available at* http://www.cancer.org/downloads/STT/

Castaneda's symptoms grew worse and worse. On June 12, he filed a grievance report, asking for the surgery recommended by Dr. Wilkinson and stating that he was "in a considerable amount of pain and . . . in desperate need of medical attention." On June 23, he reported to Lt. Walker that his lesion was emitting a foul odor, continued to leak pus, and had increased in size, pressing further on his penis and increasing his discomfort. He complained of increased swelling, bleeding from the foreskin, and difficulty in urination. On July 13, instead of scheduling a biopsy, ICE brought Castaneda to the emergency room at Scripps Mercy Chula Vista. The emergency room physician noted the fungating lesion[5] on Castaneda's penis and referred Castaneda to urologist Daniel Hunting, M.D., who, following a brief examination, determined that the lesion was "probably condyloma," or genital warts. Dr. Hunting referred Castaneda back to his "primary treating urologist" at DIHS. Four days later, Lt. Walker noted that the lesion continued to grow. On July 26, another physician's assistant explained to Castaneda that "while a surgical procedure might be recommended long-term, that does not imply that the federal government is obligated to provide that surgery if the condition is not threatening to life, limb or eyesight."

---

2008CAFFfinalsecured.pdf. Most penile cancers are, like Castaneda's, "squamous cell carcinomas (cancer that begins in flat cells lining the penis)," Nat'l Cancer Inst., U.S. Nat'l Inst. of Health, *Penile Cancer*, http://www.cancer.gov/cancertopics/types/penile (last accessed August 18, 2008), which are typically diagnosed via one of several types of skin biopsy, Am. Cancer Soc'y, *Skin Cancer — Basal and Squamous Cell: How Is Squamous and Basal Cell Skin Cancer Diagnosed?* (June 10, 2008), http://www.cancer.org/docroot/CRI/content/CRI_2_4_3X_How_is_skin_cancer_diagnosed_51.asp (last accessed August 18, 2008).

[5]*See* Nat'l Cancer Inst., U.S. Nat'l Inst. of Health, *Dictionary of Cancer Terms*, http://www.cancer.gov/templates/db_alpha.aspx?CdrID=367427 (last accessed August 18, 2008) (defining "fungating lesion" as a "type of skin lesion that is marked by ulcerations (breaks on the skin or surface of an organ) and necrosis (death of living tissue) and that usually has a bad smell").

On August 22, Castaneda saw another urologist, Robert Masters, M.D. Dr. Masters concluded that Castaneda had genital warts and was in need of circumcision, which would both relieve the "ongoing medical side effects of the lesion including infection and bleeding" and provide a biopsy for further analysis. This treatment was again denied as "elective in nature." The following month, Lt. Walker noticed "another condyloma type lesion [ ] forming and foul odor emitting from uncircumcised area with mushroomed wart." On November 14, DIHS noted that Castaneda's "symptoms have worsened. States he feels a constant pinching pain, especially at night. States he constantly has blood and discharge on his shorts . . . . Also complains of a swollen rectum which he states makes bowel movements hard." Castaneda was prescribed laxatives. The following day, Castaneda complained that the lesion was growing, that he could not stand and urinate because the urine "sprays everywhere," and that the lesion continued to leak blood and pus, continually staining his sheets and underwear. DHIS responded by increasing Castaneda's weekly allotment of boxer shorts.

On November 17, Castaneda was transferred from San Diego to ICE's San Pedro Service Processing Center. The "Medical Summary of Federal Prisoner/Alien in Transit" filed in connection with this transfer listed no "current medical problems." Nevertheless, an examination at the Los Angeles/ Santa Ana Staging area noted the presence of "other penile anomalies."

In early December, Castaneda's counsel from the ACLU became involved in his case, sending multiple letters notifying ICE and Health Service Administration officials of Castaneda's medical problems and urging that he receive the biopsy he had been prescribed almost a year earlier. Apparently in response, Castaneda was sent to yet another urologist, Lawrence S. Greenberg, M.D, on December 14. Dr. Greenberg described Castaneda's penis as a "mess," and stated that he required surgery. The ACLU continued to demand treat-

ment, to no apparent avail. Forty-one days later, January 25, 2007, Castaneda was seen by Asghar Askari, M.D., who diagnosed a fungating penile lesion that was "most likely penile cancer" and, once again, ordered a biopsy.

On February 5, rather than provide the biopsy prescribed by Doctors Wilkinson, Masters, Greenberg, and Askari, ICE instead released Castaneda, who then proceeded on his own to the emergency room of Harbor-UCLA Hospital in Los Angeles. He was scheduled for a biopsy on February 12, which confirmed that Castaneda was suffering from squamous cell carcinoma of the penis. On February 14, Castaneda's penis was amputated, leaving only a two-centimeter stump.

The amputation did not occur in time to save Castaneda's life. In addition to creating a 4.5 centimeter-deep tumor in his penis, the cancer had metastasized to his lymph nodes and throughout his body. Castaneda received chemotherapy throughout 2007, but the treatment was ultimately unsuccessful. Francisco Castaneda died February 16, 2008. He was thirty-six years old.

## B.   Procedural Background

This action began November 2, 2007, as a suit brought by Castaneda against the United States and a number of state and federal officials and medical personnel. Castaneda alleged inadequate medical care while in DOC and ICE custody that amounted to malpractice, and a violation of his constitutional rights. He asserted various malpractice and negligence claims against the United States under the FTCA and against the individual defendants under California law, and asserted constitutional claims (violations of the Fifth, Eighth, and Fourteenth Amendments) against the individual defendants under *Bivens* and 42 U.S.C. § 1983. He sought compensatory and punitive damages and declaratory relief. Following Castaneda's death, Plaintiffs-Appellants Yanira Castaneda, Castane-

da's sister and his estate's personal representative, and Vanessa Castaneda, Castaneda's daughter and sole heir, filed an amended complaint, substituting themselves as plaintiffs and adding various claims under California's Wrongful Death Statute, Cal. Code Civ. Proc. § 377.60 *et seq.*, and Survival Statute, Cal. Code Civ. Proc. § 377.20 *et seq.*

On January 14, 2008, Defendants-Appellants Commander Chris Henneford, Captain Eugene A. Migliaccio, and Commander Stephen Gonsalves, all commissioned officers of the PHS, and Defendants-Appellants Timothy Shack, M.D., and Esther Hui, M.D., both civilian employees of PHS (collectively, PHS Defendants), moved to dismiss the case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The PHS Defendants argued that they had absolute immunity from *Bivens* actions because 42 U.S.C. § 233(a) provides that an FTCA suit against the United States is the exclusive remedy for tortious acts committed by PHS officers and employees in the course of their medical duties.

On March 11, the district court denied the motion to dismiss, holding that the plain language of § 233(a) "express[ly] preserv[es]" plaintiffs' constitutional claims. *Castaneda v. United States*, 538 F. Supp. 2d 1279, 1290 (C.D. Cal. 2008). Rejecting the reasoning of the Second Circuit's decision in *Cuoco v. Moritsugu*, 222 F.3d 99, 107-09 (2d Cir. 2000), the district court held that § 233(a), through its reference to 28 U.S.C. § 1346(b), incorporated by reference the entirety of the FTCA, including the general exclusivity provision of 28 U.S.C. § 2679(b), which expressly exempts constitutional claims from the FTCA exclusivity, 28 U.S.C. § 2679(b)(2)(A). *Castaneda*, 538 F. Supp. 2d at 1288-91. It also held that the legislative history of both § 233(a) and § 2679(b) supported the conclusion that § 233(a) was not intended to preempt *Bivens* actions. *Id.* at 1291-95. The PHS Defendants timely appealed.

**Jurisdiction and Standard of Review**

District court orders denying absolute immunity constitute "final decisions" for the purposes of 28 U.S.C. § 1291, granting us jurisdiction over this interlocutory appeal. *Mitchell v. Forsyth*, 472 U.S. 511, 524-27 (1985); *Trevino v. Gates*, 23 F.3d 1480, 1481 (9th Cir. 1994). We review such decisions *de novo*. *Trevino*, 23 F.3d at 1482.

**Discussion**

**[1]** In *Bivens*, the Supreme Court established that victims of constitutional violations by federal agents have a cause of action under the Constitution to recover damages. As the Supreme Court later clarified, however, this remedy has limits:

> Such a cause of action may be defeated in a particular case, however, in two situations. The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective.

*Carlson v. Green*, 446 U.S. 14, 18-19 (1980) (internal citations omitted) (quoting *Bivens*, 403 U.S. at 396). Under *Carlson*, then, a *Bivens* remedy will not lie (1) when an alternative remedy is both (a) "explicitly declared to be a substitute" and (b) is "viewed as equally effective," or (2) in the presence of "special factors" which militate against a direct recovery remedy.

*Carlson* provides the starting point for our analysis in this case. The facts and posture of *Carlson* closely resembled those here: in *Carlson*, the plaintiff, the mother of a deceased

federal prisoner, brought suit against federal prison officials on behalf of her son's estate, alleging Eighth Amendment violations. Specifically, she alleged that the federal officials' deliberate indifference to his serious medical needs, amounting to an Eighth Amendment violation, caused the decedent, a chronic asthmatic, to die of respiratory failure. *Id.* at 16 & n.1. The defendants argued that the FTCA provided a substitute remedy preempting one under *Bivens*. After noting the two ways in which a *Bivens* remedy can be preempted, the Court held that "[n]either situation obtains in this case." *Id.* at 19. First, the Court held that "the case involve[d] no special factors counseling hesitation." *Id.* Second, there was no congressional declaration foreclosing the *Bivens* claim and making the FTCA exclusive. No statute declared the FTCA to be a substitute for *Bivens*, and subsequent legislative history "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.* at 20. The Court further noted four ways in which the remedy in the FTCA could not be seen as an "equally effective" substitute for a *Bivens* remedy. *Id.* at 20-23; *see also infra* pp. 15-17.

In this case, too, we have an individual who has died, allegedly due to the deliberate indifference of the federal officials charged with his health and safety. Once again, the decedent's survivors bring a *Bivens* action, alleging Fifth and Eighth Amendment violations.[6] And, once again, the officials argue

---

[6]Unlike the prisoner in *Carlson*, Castaneda was an immigration detainee, not a criminal convict. The argument below framed the issue in terms of a violation of the Eighth Amendment, *Castaneda*, 538 F. Supp. 2d at 1286, and the district court therefore ruled accordingly, *id.* at 1295-98. Castaneda's criminal sentence was complete by the time of his transfer to ICE, and his civil detention in SDCF and San Jose was not "punishment." Plaintiffs' claims against the PHS Defendants, strictly speaking, are therefore rooted in the Fifth Amendment's Due Process clause, not the Eighth Amendment's prohibition on cruel and unusual punishment. *See Bell v. Wolfish,* 441 U.S. 520, 536-37 & n.16 (1979). In this case, however, that formal distinction is irrelevant: "[w]ith regard to medical needs, the due process clause imposes, at a minimum, the same duty the Eighth

that the FTCA preempts any *Bivens* remedy. The difference is that this time, they do so on the basis of 42 U.S.C. § 233(a), which provides a remedy under the FTCA, rather than on the basis of the FTCA itself.

42 U.S.C. § 233(a) provides:

> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 . . . for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions . . . by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

There is no dispute that the PHS Defendants were, during all relevant times, commissioned officers or employees of the Public Health Service, and were acting within the scope of their offices or employment. The PHS Defendants claim that the exclusivity provision in § 233(a) acts either to expressly substitute the FTCA for a *Bivens* remedy, or as a "special factor" that would preclude the *Bivens* remedy. We examine each of these arguments in turn.

---

Amendment imposes." *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002).

Plaintiffs additionally claim a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, alleging that Castaneda was invidiously denied medical care due to his immigration status and without a rational basis. *Carlson*, too, involved an equal protection claim: "that petitioners['] . . . indifference was in part attributable to racial prejudice." 446 U.S. at 16 n.1; *see also Davis v. Passman*, 442 U.S. 228 (1979) (*Bivens* relief is available to enforce the equal protection component of the Fifth Amendment's Due Process Clause).

## A. Does § 233(a) Expressly Establish the FTCA as a Substitute Remedy for *Bivens*?

As noted above, *Carlson* established a two-part test for express *Bivens* preemption: Congress must provide an alternative remedy that is "explicitly declared to be a *substitute* for" *Bivens* (rather than a complement to it) *and* Congress must view that remedy as "equally effective." 446 U.S. at 18-19. Both these elements must be present for a court to find the *Bivens* remedy expressly displaced. We first address the "equally effective" question discussed in *Carlson*.

### 1. *"Viewed as Equally Effective"*

[2] The alternative remedy in *Carlson*, like the remedy here, was the FTCA. In *Carlson*, the Supreme Court held that Congress does not view the FTCA as providing relief that is "equally effective" as *Bivens* relief. There is no basis here on which to distinguish that holding from the case before us; if anything, the FTCA is a *less* effective remedy now than it was when *Carlson* was decided.

*Carlson* enumerated four factors, "each suggesting that the *Bivens* remedy is more effective than the FTCA remedy." 446 U.S. at 20. First, *Bivens* damages are awarded against individual defendants, while the FTCA damages are recovered from the United States. "Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States. It is almost axiomatic that the threat of damages has a deterrent effect, particularly so when the individual official faces personal financial liability." *Id.* at 21 (citations omitted). Second, punitive damages are not available under the FTCA, further undermining its deterrent effect. "Punitive damages are 'a particular remedial mechanism normally available in the federal courts,' and are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights. . . . But punitive damages in an FTCA suit are statutorily prohibited.

28 U.S.C. § 2674. Thus FTCA is that much less effective than a Bivens action as a deterrent to unconstitutional acts." *Id.* at 22 (quoting *Bivens*, 403 U.S. at 397) (citations omitted). Third, *Bivens* cases may be tried before a jury; FTCA cases cannot. *Id.* at 22-23. "Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington*, 542 U.S. 296, 306 (2004). This is particularly important in the context of constitutional torts, where the actions of the government itself are on trial. Moreover, juries are well-suited to the task of apportioning damages. As Congress noted in explaining the need for jury trials under Title VII, "[j]uries are fully capable of determining whether an award of damages is appropriate and if so, how large it must be to compensate the plaintiff adequately and to deter future repetition of the prohibited conduct." H.R. Rep. No. 102-40, at 72 (1991). Lastly, the FTCA's limitation that the United States may be held liable "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), would violate the policy "obvious[ly]" motivating *Bivens* "that the liability of federal officials for violations of citizens' constitutional rights should be governed by uniform rules." *Carlson,* 446 U.S. at 23. This last factor was especially important to the Supreme Court. In *Carlson*, the plaintiff's action would have failed under the survivorship law of the forum state, Indiana. *Id.* at 17 n.4.[7] The Court emphasized that "only a uniform federal rule of survivorship will suffice to redress the constitutional deprivation here alleged and to protect against repetition of such conduct." *Id.* at 23.

---

[7]In particular, Indiana law provided that a personal injury claim did not survive where the acts complained of caused the victim's death. Ind. Code § 34-1-1-1 (1976). Moreover, where the decedent was not survived by a spouse or dependent next of kin, Indiana's wrongful death statute limited recovery to those expenses incurred in connection with the death itself. Ind. Code § 34-1-1-2 (1976). Indeed, the district court held that, because of the limitations in those two statutes, the plaintiff (the decedent's mother) could not even meet the amount-in-controversy then required by 28 U.S.C. § 1331(a), and dismissed the case for lack of subject matter jurisdiction. *Carlson*, 446 U.S. at 17-18 & n.4.

None of the factors listed by the Supreme Court is any less present in the case before us. The FTCA would be no more a deterrent here than it was in *Carlson*, because FTCA damages remain recoverable only against the United States and because punitive damages remain unavailable. 28 U.S.C. § 2674. Likewise, an FTCA plaintiff still cannot demand a jury trial. 28 U.S.C. § 2402. Moreover, the FTCA remedy continues to depend on the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Nowhere does this reliance on state law present a greater threat to uniformity of remedy than in actions "for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions." 28 U.S.C. § 322(a). Since *Carlson* was decided in 1980, the United States has witnessed a revolution in state tort law, focusing on medical malpractice in particular. Reacting to a "crisis" in medical malpractice insurance costs and availability, many states began in the mid-1980s to enact legislative changes designed both to deter frivolous lawsuits and to limit the size of damage awards even in meritorious ones. *See generally* Cong. Budget Office, U.S. Cong., *The Effects of Tort Reform: Evidence from the States* 2-3 (2004), *available at* http://www.cbo.gov/ftpdocs/55xx/doc5549/ Report.pdf. Twenty-four states, for example, have abolished the collateral-source rule, often permitting collateral-source payments to offset damage awards. Am. Tort Reform Ass'n, *Tort Reform Record* 14-18 (July 1, 2008), *available at* http:// www.atra.org/files.cgi/8291_Record_07-08.pdf. Similarly, twenty-three states have placed statutory limits on non-economic damages, many limiting medical malpractice awards in particular. *Id.* at 32-39. Statutory damage caps for malpractice can range from $250,000, *see, e.g.*, Cal. Civ. Code § 3333.2(b), to $1.25 million, Ind. Code § 34-18-14-3(a); *see also* Haw. Rev. Stat. § 663-8.7 ($375,000); Fla. Stat. § 766.118(2) ($500,000); Kan. Stat. Ann. § 60-3407(a) ($1 million). Other states have introduced procedural innovations to screen out meritless suits and encourage early settlement,

such as requiring that plaintiffs, prior to suit, obtain expert certificates of merits, *e.g.*, Va. Code § 8.01-20.1; W. Va. Code § 55-7B-6, or submit their claims to medical screening panels, *e.g.*, Alaska Stat. § 09.55.536; Haw. Rev. Stat. § 671-12, or participate in other compulsory alternative dispute resolution bodies, *e.g.*, Md. Code, Cts. & Jud. Proc. § 3-2A-04; Wash. Rev. Code § 7.70.100.[8] Were Plaintiffs' sole remedy for the alleged mistreatment and death of Castaneda a common law malpractice suit against the United States, as the PHS Defendants argue, the damages they could recover, and the quasi-substantive procedural hurdles they would have to surmount to bring suit in the first place, would vary from state to state even more now than in 1980.

**[3]** The Supreme Court has never revisited its conclusion that the FTCA's dependence on "the vagaries of the laws of the several States" prevents it from serving as an equally effective remedy for constitutional violations. *Carlson*, 446 U.S. at 23. While the Supreme Court has, in subsequent years, found that the congressional institution of *other* remedial schemes that are not fully compensatory may be a "special factor" precluding *Bivens* relief, *see Schweiker v. Chilicky*, 487 U.S. 412 (1988) (Social Security); *Bush v. Lucas*, 462 U.S. 367 (1983) (federal civil service); *see also Adams v. Johnson*, 355 F.3d 1179 (9th Cir. 2004) (federal income tax), those cases cannot serve as a basis for distinguishing the Supreme Court's explicit determination in *Carlson* that the very remedy at issue here, the FTCA, is not viewed by Congress as equally effective as *Bivens*. Moreover, every one of those subsequently examined schemes, however otherwise undercompensatory, nonetheless provided a *uniform* remedy

---

[8]We express no opinion here as to whether or how these or similar procedural requirements would apply in an FTCA suit against the United States, although we note that several district courts have found certain of these statutes to apply to FTCA actions. *See, e.g.*, *Stanley v. United States*, 321 F. Supp. 2d 805, 807-08 (N.D. W. Va. 2004); *Hill v. United States*, 751 F. Supp. 909, 910 (D. Colo. 1990); *Oslund v. United States*, 701 F. Supp. 710, 712-14 (D. Minn. 1988).

across the United States. *Carlson*'s holding that the FTCA, in particular, is not "equally effective" because of its lack of deterrent effect, its absence of a right to a jury trial, and its dependence on variable state law remains binding on this court, and, accordingly, following *Carlson*, we hold that § 233(a) does not preempt *Bivens* relief.

### 2. *"Explicitly Declared To Be a Substitute"*

[4] A careful analysis of the first prong of the *Carlson* "explicit[ ] . . . substitute . . . and . . . equally effective [remedy]" standard, *Carlson,* 446 U.S. at 18-19, also compels the conclusion that § 233(a) does not preclude relief under *Bivens*. The PHS Defendants maintain that, in § 233(a), Congress "explicitly declared [the FTCA] to be a substitute for recovery directly under the Constitution." *Id.* Specifically, the PHS Defendants urge that we read § 233(a)'s command that the FTCA remedy "shall be exclusive of any other civil action or proceeding" to necessarily include actions or proceedings seeking a *Bivens* remedy. We decline to do so.

### a. Text

[5] The plain text alone of § 233 makes it clear that Congress did not explicitly declare § 233(a) to be a substitute for a *Bivens* action. The section does not mention the Constitution or recovery thereunder, let alone "explicitly declare[ ]" itself to be a "substitute for recovery directly under the Constitution." *Carlson*, 446 U.S. at 18-19.

[6] Moreover, § 233(a) cannot be read as an expression of Congress's desire to substitute the FTCA in place of *Bivens* relief for the simple reason that *Bivens* relief did not exist when § 233(a) was enacted. *See* Emergency Health Personnel Act of 1970, Pub. L. No. 91-623, 84 Stat. 1868 (1970); *Bivens*, 403 U.S. 388 (1971). *Carlson* requires an intention to *substitute* one form of relief for another, but substitution does not occur, and is in fact impossible, if the person or thing

being "replaced" does not exist. Because *Bivens* relief did not exist at the time of § 233(a)'s enactment, as well as because there is no mention of constitutional torts in its text, we cannot read the text of § 233(a) as a declaration of Congress's intent to substitute the FTCA for *Bivens* relief.

### b. History

**[7]** Our conclusion that § 233(a) does not constitute an explicit declaration that the FTCA is a substitute for *Bivens* actions is supported by the history of the legislation in question. That history demonstrates that the exclusivity provision of § 233(a) was intended to preempt a particular set of tort law claims related to medical malpractice.

Although codification can produce the illusion of a timeless, unitary law, statutes are passed in particular historic and legal contexts and their language must be read and interpreted with that context in mind. "[O]ur evaluation of congressional action in 197[0] must take into account its contemporary legal context."[9] *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 (1979); *see also Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 411 (1979) (describing courts' "obligation to honor the clear meaning of a statute, as revealed by its language, purpose, *and history*") (emphasis added); *Aldridge v. Williams*, 44 U.S.

---

[9]Public context is especially important in examining "Congress's enactment (or reenactment) of . . . verbatim statutory text." *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001). In this case, the key preemptive phrase, "exclusive of any other civil action or proceeding by reason of the same subject matter against the employee," was identical to language in the Federal Drivers Act, which at the time provided that the FTCA was the exclusive remedy "for personal injury, including death, resulting from the operation by any employee of the Government of any motor vehicle while acting within the scope of his office or employment." 28 U.S.C. § 2679(b) (1970). If constitutional tort suits against Public Health Service officers and employees, arising out of performance of their medical duties, seemed like a remote possibility in 1970, they would have seemed positively Dada for suits against drivers of motor vehicles in 1961. *See* Pub. L. No. 87-258, 75 Stat. 539 (1961).

9, 24 (1845) (stating that courts interpreting legislation should look, "if necessary, to the public history of the times in which it was passed"). Thus, although the term "any other civil action or proceeding" may appear clear in ahistorical isolation, "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000).

**[8]** As the Court noted in *Carlson*, the FTCA was enacted long before *Bivens* recognized a right of action under the Constitution. 446 U.S. at 19. Section 233(a), too, predated *Bivens*: it was passed December 31, 1970, almost six months before *Bivens* was decided the following June, and almost six years before the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97 (1976), established the "deliberate indifference" standard for prisoner medical care under the Eighth Amendment. Emergency Health Personnel Act of 1970, Pub. L. No. 91-623, 84 Stat. 1868 (1970). It is therefore unsurprising that § 233(a) says nothing about preempting direct constitutional remedies—such remedies were not recognized at the time of its passage. An ordinary reader, at the time of § 233(a)'s passage, would have understood "any other civil action or proceeding" with respect to "personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions" to refer instead to a host of common-law and statutory malpractice actions.[10]

**[9]** This understanding is borne out by the legislative history of § 233(a), which reveals that Congress's exclusive concern was with common law malpractice liability. The only

---

[10]At oral argument, *amicus* the United States noted that while the Supreme Court had not decided *Bivens* when § 233(a) was passed, it had already granted *certiorari* in the case the previous June. *See* 399 U.S. 905 (1970). This does not make the directive more "explicit"; at best, it introduces a further element of ambiguity as to whether § 233(a) was intended to preempt constitutional claims.

two statements on the floor of either house of Congress respecting the bill mentioned only medical malpractice, with nothing being said about constitutional violations. *See* 91 Cong. Rec. H42,543 (1970) (statement of Rep. Staggers) ("So they have asked, if in the event there is a suit against a PHS doctor alleging malpractice, the Attorney General of the United States would defend them in whatever suit may arise."); 91 Cong. Rec. S42,977 (1970) (statement of Sen. Javits) ("I am pleased to support . . . the provision for the defense of certain malpractice and negligence suits by the Attorney General."). Representative Staggers noted that the Surgeon General had requested the amendment because PHS physicians "just cannot afford to take out the customary liability insurance as most doctors do." 91 Cong. Rec. H42,543. The section itself was titled in the Statutes at Large[11] "Defense of Certain Malpractice and Negligence Suits." 84 Stat. at 1870; *see Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("[T]he title of a statute and the heading of a section are tools available for a resolution of a doubt about the meaning of a statute.") (internal quotation marks omitted). Thus, not only is the authoritative text of the statute silent as to constitutional torts in particular, but the title and legislative history, if anything, indicate an exclusive concern with state malpractice claims.[12]

---

[11]When § 233 was codified in the United States Code, it was given the title "Exclusiveness of Remedy." *See* 42 U.S.C. § 233. Title 42 of the U.S.C., however, has not been enacted into positive law. *See* 1 U.S.C. § 204 note. To the extent title or heading can affect our reading of otherwise ambiguous statutory language, then, it is the Statutes at Large that provide us with the "legal evidence of [the] law[ ]." *U.S. Nat'l Bank of Oreg. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 & n.3.

[12]We disagree with PHS Defendants' and *amicus* the United States' contention that "malpractice" here encompasses cruel and unusual punishment or violations of due process under the Eighth or Fifth Amendments, respectively. As we have noted, it certainly did not in 1970. The term *malpractice*, in ordinary speech, even now connotes negligence or incompetence in performing one's professional duties. *See Black's Law Dictionary* 978 (8th ed. 2004) (defining "malpractice" as synonymous with "profes-

**[10]** Subsequent congressional action has revealed no inclination to make the FTCA a substitute remedy for *Bivens* actions. *See Brown & Williamson*, 529 U.S. at 143 ("At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings."). The FTCA itself has been modified to add an express exclusivity provision and to provide that the

---

sional negligence" and "medical malpractice" as a "doctor's failure to exercise the degree of care and skill that a physician or surgeon of the same medical specialty would use under similar circumstances"). In *Estelle v. Gamble*, the Supreme Court stressed the difference between malpractice and an Eighth Amendment violation: "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 429 U.S. at 106.

While the acts giving rise to a constitutional action might also give rise to one for malpractice, the two are nonetheless quite distinct. In *Bivens*, the Supreme Court rejected a view of "the relationship between a citizen and a federal agent unconstitutionally exercising his authority as no different from the relationship between two private citizens," noting that an "agent acting—albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." 403 U.S. at 391-92.

That observation is particularly relevant here. To describe the allegations in the complaint as averring mere "malpractice" is to miss the point. Castaneda was not a walk-in patient at Defendants' clinic; neither are Defendants merely alleged to have misread a chart or fumbled a scalpel. The ordinary doctor, no matter how careless, does not hold her patients under lock and key, affirmatively preventing them from receiving the medical care they need and demand. Even when denying his requests for a biopsy in the fall of 2006, DIHS officials were aware that Castaneda "is not able to be released to seek further care due to mandatory hold and[,] according to ICE authorities, may be with this facility for a while." The Kafkaesque nightmare recounted in Plaintiffs' complaint, which we assume here to be true, draws its force not only from Defendants' alleged deliberate indifference, but also from Castaneda's *state-imposed helplessness* in the face of that indifference. The element of state coercion transforms this into a species of action categorically different from anything Congress would likely term "malpractice."

provision does not bar actions for constitutional torts. In response to the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292, 299 (1988),[13] Congress passed the Federal Employees Liability Reform and Tort Compensation Act of 1988 (LRTCA), Pub. L. No. 100-694 (1988). The LRTCA expanded 28 U.S.C. § 2679(b), which previously made the FTCA the exclusive remedy for injury resulting from a federal employee's operation of a motor vehicle, to encompass *any* "injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). Because, under the FTCA, the United States is substituted as the defendant in place of employees acting within the scope of their official duties, the LRTCA acts as a general grant of immunity to government employees for all such acts. The amendment went on to clarify that general immunity "does not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States." *Id.* § 2679(b)(2)(A). In so doing, Congress made explicit what, when *Carlson* was decided, had previously been implicit: that "constitutional claims are outside the purview of the Federal Tort Claims Act." *Billings v. United States*, 57 F.3d 797, 800 (9th Cir. 1995). It would defy logic to suppose that § 233(a) must be read, despite the lack of any statutory language or legislative history counseling such a reading, to smuggle them back in again for this one subset of defendants.

[11] What is more, the legislative history of the LRTCA makes it clear that Congress viewed the general grant of immunity it was extending to all employees, which expressly exempted constitutional claims, to be identical to the immu-

---

[13]In *Westfall*, the Supreme Court held that "absolute immunity does not shield official functions from state-law tort liability unless the challenged conduct is within the outer perimeter of an official's duties and is discretionary in nature." 484 U.S. at 300.

nity it had already extended to PHS officers and employees sixteen years earlier.[14] The House Report, in discussing the effect of the LRTCA, noted:

> There is substantial precedent for providing an exclusive remedy against the United States for the actions of Federal employees. Such an exclusive remedy has already been enacted to cover the activities of certain Federal employees, including . . .
>
> . . .
>
> 3. Medical Personnel. — The FTCA is the exclusive remedy for medical or dental malpractice on the part of the medical personnel of most federal employees.

H.R. Rep. No. 100-700, at 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5948 (citing 42 U.S.C. § 233). The same Report noted the "sharp distinction between common law torts and constitutional or *Bivens* torts" and suggested that a constitutional tort involves "a more serious intrusion of the rights of an individual that merits special attention." *Id.* at 6, 5948 U.S.C.C.A.N. at 5950. The Report emphasized that the " 'exclusive remedy' provision . . . [was] intended to substitute the United States as the sole[ ] permissible defendant in all *common law* tort actions," *id.*, but declared that the provision "expressly does not extend to . . . constitutional torts," *id.* at 5949.

Testifying before the House Committee on the Judiciary, a senior Justice Department official stated:

> [T]he exclusive remedy provision [of § 2679(b)(1)]

---

[14]*Cf. Carlson*, 446 U.S. at 19-20 (examining legislative history of subsequent amendments to the FTCA to determine whether Congress viewed it as a substitute or complementary remedy).

is based on a very well-established precedent. Seven such exclusive remedy provisions already exist. They apply to drivers of vehicles, to physicians employed by various agencies, and to Department of Defense attorneys.

[The LRTCA] simply extends those provisions to all Federal employees. Because of this precedent, we have considerable experience with such exclusive remedy provisions. They work well and fairly, have been widely accepted, and are not controversial.

*Legislation To Amend the Federal Tort Claims Act: Hearing Before the Subcomm. on Administrative Law and Government Relations of the H. Comm. on the Judiciary*, 100th Cong. 58 (1988) (testimony of Robert L. Willmore, Deputy Assistant Attorney General) (hereinafter Willmore Testimony). In the very next breath, however, the Deputy Assistant Attorney General agreed that "we want to avoid the constitutional torts issue." *Id*.; *see also id.* at 76 (statement of Willmore) ("H.R. 4358 would do nothing more than extend the protection now enjoyed by doctors, drivers, and [Defense Department] attorneys to all federal employees."), 78-79 (describing legislation to make the FTCA exclusive of *Bivens* claims as "controversial").

The PHS Defendants argue that to construe § 233(a) to preempt only common law and statutory tort actions would render it superfluous, since, post-LRTCA, PHS officers and employees are already immune from those actions under § 2679(b)(1). Even if § 233 were now superfluous because of the subsequent enactment of the LRTCA some 18 years later, it unquestionably was not superfluous at the time it was enacted.

We would certainly hesitate to read a statute in a manner that would leave an entire subsection superfluous, and we do not do so here. *See Christensen v. Comm'r*, 523 F.3d 957, 961

(9th Cir. 2008) ("We should avoid an interpretation that would render [entire] subsections redundant."). The canon against redundancy is rooted in the notion (perhaps aspirational) that Congress would not do anything as preposterous as to pass a statute that was, in part or in whole, a nullity *ab initio*. *Cf. Int'l Ass'n of Machinists & Aerospace Workers v. BF Goodrich Aerospace Aerostructures Group*, 387 F.3d 1046, 1057 (9th Cir. 2004) (" '[A]bsent clear congressional intent to the contrary, the legislature did not intend to pass vain or meaningless legislation.' ") (quoting *Coyne & Delany Co. v. Blue Cross & Blue Shield of Va., Inc.*, 102 F.3d 712, 715 (4th Cir. 1996)) (alterations omitted). The presumption applies more weakly in situations, like this one, in which the provision is potentially rendered superfluous by language contained in a separate, later statute. *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991) (we must "mak[e] every effort not to interpret a provision in a manner that renders other provisions *of the same statute* inconsistent, meaningless or superfluous.") (emphasis added). Indeed, "[r]edundancies across statutes are not unusual events in drafting," *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and it would not be surprising to a frequent reader of federal statutes that Congress might pass a later, more comprehensive statute that has the effect of rendering an earlier statute redundant, at least in part.[15] The Supreme Court has already held that § 2679(b) applies to all federal employees,

[15]*See Germain*, 503 U.S. at 256 (O'Connor, J., concurring in the judgment) ("I think it far more likely that Congress inadvertently created a redundancy than that Congress intended to withdraw appellate jurisdiction over interlocutory bankruptcy appeals by the roundabout method of reconferring jurisdiction over appeals from final bankruptcy orders."); *Zorich v. Long Beach Fire Dep't & Ambulance Serv., Inc.*, 118 F.3d 682, 686 (9th Cir. 1997) (holding that a later, more general statute did not render a prior one superfluous because they provide "two separate means of qualifying for coverage"); *cf.* 2B Normal J. Singer, Sutherland Statutes and Statutory Construction § 51:5 (7th ed. 2007) ("A later general act may be held to supercede a prior narrower one where the later act purports to deal comprehensively with the subject to which it pertains.").

regardless of whether they were covered by pre-LRTCA immunities. *See United States v. Smith*, 499 U.S. 160, 172-73 (1991) ("The Liability Reform Act's plain language makes no distinction between employees who are covered under pre-Act immunity statutes and those who are not.").[16]

[12] In any event, we disagree that our reading makes the text of § 233(a) superfluous, post-LRTCA. A review of the rest of § 233 reveals why: subsection (a) remains the lynchpin of the entire balance of the section. *See Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."). Other subsections of § 233 have extended subsection (a) protection to private persons and entities (who are not otherwise "employees" covered by FTCA) by stating that they are to be "deemed to be an employee of the Public Health Service."[17] Still other subsections involve the administration and

_____

[16]In *Smith*, the pre-LRTCA immunity in question was the Gonzalez Act, 10 U.S.C. § 1089(a), which, like § 233(a), provides that the FTCA is the exclusive remedy for personal injury caused by armed forces physicians. Below, this court, joining the Eleventh Circuit, held that § 1089(a) granted immunity only for torts occurring in the United States. *See Smith v. Marshall*, 885 F.2d 650, 652-54 (9th Cir. 1989); *Newman v. Soballe*, 871 F.2d 969, 974 (11th Cir. 1989). The Supreme Court reversed, holding that, regardless of whether the Gonzalez Act would immunize foreign conduct, the LRTCA did, and the individual defendants were therefore immune. *United States v. Smith*, 499 U.S. at 172.

*Smith* thus presented the opposite question from that posed here: in *Smith*, the pre-LRTCA immunity statute purportedly contained an exception to immunity not in the LRTCA; in our case, PHS Defendants argue that the LRTCA contains an exception to immunity not in the pre-LRTCA immunity statute. Because we hold that § 233(a) does not provide an immunity for *Bivens* torts, *Smith* is of little relevance to us here beyond the proposition for which we cite it in the text above.

[17]*See* § 233(g) (operators of health centers receiving federal funds under 42 U.S.C. § 254(b), (j) (officers, employees, or contractors of health center operators), (m) (managed care plans entering into contracts with health centers), (o) (health professionals volunteering at free clinics), (p) (professionals carrying out smallpox countermeasures in the event of "bioterrorist incident" or other emergency).

limitation of this preemption.[18] Section 233(a), by defining the scope of immunity granted uniquely to PHS employees (respecting only "the performance of medical, surgical, dental, or related functions"), allows PHS and the Attorney General to provide a limited grant of immunity to volunteers and recipients of federal funds. After the LRTCA, then, the ongoing function of § 233, read as a whole, is to extend the FTCA exclusivity to private entities, much like many other statutes scattered throughout the U.S. Code. *See, e.g.*, 23 U.S.C. § 510(g)(1) (immunizing official acts by employees of National Academy of Sciences carrying out the future strategic highway research program); 42 U.S.C. § 5055(f)(1)(A) (volunteers of the Domestic Volunteer Services); 42 U.S.C. § 247d-6a(d)(2)(A) (Health and Human Services contractors involved in research and development activities related to "qualified countermeasures" against certain weapons of mass destruction); 50 U.S.C. § 2783(b)(1) (government contractors under Atomic Testing Liability Act). It would, indeed, be superfluous to add an explicit exemption for such "deemed" employees from *Bivens* actions because such private actors are not subject to *Bivens* actions. *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61 (2001).

### c.   Context

[13] In addition to historical context, individual statutes are located within a greater statutory and remedial context. We must "find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *United States v. Alghazouli*, 517 F.3d 1179, 1184 (9th Cir. 2008) (quoting *Comm'r v. Engle*, 464 U.S. 206, 217 (1984)). As we have noted, § 233(a) is not the

---

[18]*See, e.g.*, § 233(h) (qualifications for designation under subsection (g)), (k) (estimation of annual claims and establishment of fund), (n) (reports to Congress detailing United States' risk exposure by virtue of deemed employees).

only statute that makes the FTCA the exclusive remedy for injuries committed by certain classes of federal employees (although their meaning is not before us here). Most, like § 233(a), concern federal medical personnel. Some expressly limit themselves to actions involving "malpractice or negligence." 22 U.S.C. § 2702(a)(1) (State Department medical personnel); 38 U.S.C. § 7316(a)(1)(A) (Veterans Health Administration). Others specify in the text only a "negligent or wrongful act or omission." 10 U.S.C. § 1089(a) (Department of Defense, Armed Forces Retirement Home, and Central Intelligence Agency medical personnel); 42 U.S.C.A. § 2458a (NASA). Additionally, Department of Defense lawyers are given immunity for any "negligent or wrongful act or omission" connected with their provision of legal services. 10 U.S.C. § 1054(a). All, like § 233(a), mention "malpractice" in their title. All of these classes of employee might, absent § 2679(b)(1), face substantial common law and statutory malpractice liability.[19] Granting these individuals, along with all federal employees driving motor vehicles (the former function of § 2679(b)), immunity from state negligence actions served a very real, obvious common purpose.[20]

PHS Defendants and *amicus* the United States, however, have provided no explanation for why Congress would want to provide these persons with the privilege, shared with no other federal employees, to *violate the Constitution* without

---

[19]Notably, all the above statutes were passed well before the LRTCA gave a general grant of immunity to federal employees, with the exception of 38 U.S.C. § 7316, which was added in 1991. *Department of Veterans Affairs Health-Care Personnel Act of 1991*, Pub. L. No. 102-40, 105 Stat. 187 (1991). As we have seen, however, that statute was itself simply a recodification of the much older pre-LRTCA immunity formerly located at 38 U.S.C. § 4116(a). *See id.* § 402, 105 Stat. at 238 (renumbering § 4116 as § 7316).

[20]*See* Willmore Testimony at 76 (describing pre-LRTCA immunities as allowing "the United States . . . to develop a consistent and uniform approach to medical malpractice and automobile tort litigation—two of the most common types of common law torts").

consequence. *See Malesko*, 534 U.S. at 76 (Stevens, J., dissenting) ("Nor have we ever suggested that a category of federal agents can commit Eighth Amendment violations with impunity."). Why should the physicians who treat our soldiers' families[21] be immune from constitutional torts while the physicians who treat our veterans are not? Why distinguish the Bureau of Prisons medical personnel who allowed a man in federal custody to die in *Carlson* from the PHS personnel who allegedly relegated a man in immigration detention to a similar outcome here? What is it about Department of Defense attorneys, alone among our government's legions of legal personnel, that they deserve such solicitude?

The LRTCA was passed to abolish such arbitrary distinctions. In his written statement to Congress, the Deputy Assistant Attorney General noted the absurdity of treating doctors, drivers, and Defense Department lawyers differently from all other federal employees. "For example, lawyers involved in Department of Commerce contracting should be protected from personal liability for their professional advice, just like their counterparts in the Department of Defense." Willmore Testimony at 76. Yet twenty years later, his successors at the Justice Department would have us re-introduce the exact same disparity in miniature, immunizing one set of doctors and lawyers from *Bivens* liability, and leaving the rest on the hook.

**[14]** Had Congress intended this result, it surely would have said so—in the statute itself, in its title, or in the legislative history. Instead, the statute is silent as to the Constitution, and both the title and contemporary and subsequent legislative

---

[21]Military personnel themselves are generally unable to bring *Bivens* actions for injuries that " 'arise out of or are in the course of activity incident to service.' " *United States v. Stanley*, 483 U.S. 669, 683 (1987) (quoting *Feres v. United States*, 340 U.S. 135, 146 (1950)). Notably, although it was ultimately disposed of on other grounds, at no point in the *Stanley* litigation, which involved U.S. Army physicians' secret experimentation with LSD on unsuspecting soldiers, does it appear that it occurred to anyone to invoke 10 U.S.C. § 1089.

history suggest that Congress intended to preclude only common law malpractice claims. This cannot be what the Supreme Court meant by an explicitly declared substitute. We therefore hold that § 233(a) does not explicitly declare the FTCA to be a substitute remedy for *Bivens* actions against PHS officers and employees.

### 3.  *Cuoco v. Moritsugu*

We recognize that our holding in this case conflicts with the Second Circuit's decision in *Cuoco v. Moritsugu*, 222 F.3d 99. In *Cuoco*, the court relied on dicta in *Carlson* which it read to imply that § 233(a) was an expressly declared substitute for *Bivens*. *Id.* at 108. In *Carlson*, the Supreme Court wrote that its conclusion that the FTCA complements *Bivens*, rather than replaces it,

> is buttressed by the significant fact that Congress follows the practice of explicitly stating when it means to make FTCA an exclusive remedy. See 38 U.S.C. § 4116(a), *42 U.S.C. § 233(a)*, 42 U.S.C. § 2458a, 10 U.S.C. § 1089(a), and 22 U.S.C. § 817(a) (malpractice by certain Government health personnel); 28 U.S.C. § 2679(b) (operation of motor vehicles by federal employees); and 42 U.S.C. § 247b(k) (manufacturers of swine flu vaccine).

446 U.S. at 20 (emphasis added). In the middle of a discussion about *Bivens* preemption, it is easy to skip over what, buried in a string citation, the Supreme Court actually said was preempted under § 233(a), et al., i.e., actions for "malpractice." Indeed, the Court also cited 38 U.S.C. § 4116(a) (1980), which by its terms expressly limited Veterans Health Administration medical personnel's immunity to actions "allegedly arising from malpractice or negligence."[22] Moreover,

---

[22]*Cuoco* found this express limitation in § 4116(a)'s modern successor, 38 U.S.C. § 7316(a)(1), to be meaningful for interpreting § 233(a).

before the passage of the LRTCA's general "exclusive remedy" provision, the enumerated statutes were the *only* statutes that provided that the FTCA to be exclusive of *any* remedy. We believe that the better reading of the Court's dictum in *Carlson* is that just as Congress, through certain statutes, made the FTCA a substitute remedy for medical malpractice actions, so it could—but did not—declare the FTCA to be a substitute remedy for federal constitutional claims.

*Cuoco* also failed to discuss whether Congress viewed the remedies provided under the FTCA as "equally effective" as those provided under *Bivens*, a question that the *Carlson* Court explicitly answered in the negative. Because, under *Carlson*, compliance with its "equally effective" prong is a necessary pre-condition for holding a statutory remedy to be a substitute for a *Bivens* cause of action, *Cuoco*'s failure to address that prong or the answer provided by *Carlson* is contrary to governing Supreme Court precedent. Accordingly, we cannot agree with the Second Circuit's analysis or application of *Carlson*.

## B. Do "Special Factors" Exist Here Warranting a Finding of Implicit Preemption?

[15] Both the Supreme Court and this court have recognized that even where Congress fails to explicitly declare a remedy to be a substitute for recovery directly under the Constitution or to provide a remedy that is as effective a remedy for a constitutional tort, a *Bivens* action may still be pre-

---

Because § 7316(a)(1) mentions "malpractice or negligence," and § 233(a) does not, the Second Circuit held that § 233(a)'s reach extended to constitutional torts as well. 222 F.3d at 108. The Second Circuit did not mention the presence of the term "malpractice" in § 233(a)'s title, perhaps overlooked, since that title does not appear in the United States Code. At any rate, we believe that Supreme Court did not find that omission to be a critical difference in *Carlson*, citing the two statutes, one right after the other, as both standing for the proposition that the FTCA is the exclusive remedy for "malpractice by certain Government health personnel." 446 U.S. at 20.

cluded. As *Carlson* noted, a *Bivens* action will not lie "when defendants demonstrate 'special factors counselling hesitation in the absence of affirmative action by Congress.' " 446 U.S. at 18 (quoting *Bivens*, 403 U.S. at 396). "The presence of a deliberately crafted statutory remedial system is one 'special factor' that precludes a *Bivens* remedy." *Moore v. Glickman*, 113 F.3d 988, 991 (9th Cir. 1997). PHS Defendant Cmdr. Henneford and the United States contend that, even if § 233(a) is not an explicit substitution of the FTCA for *Bivens*, it nonetheless constitutes a "deliberately crafted statutory remedial system," *id.*, [Henneford Br. at 31] such that we ought to find that the FTCA impliedly displaces *Bivens* for suits against PHS officers and employees.

Neither Cmdr. Henneford nor any other PHS Defendant appears to have raised any argument based on the presence of "special factors" before the district court. [*See* Dk. # 19 (Notice of Motion and Motion to Dismiss for Lack of Jurisdiction); # 42 (Reply in Support of Motion to Dismiss for Lack of Jurisdiction)] "Generally, in order for an argument to be considered on appeal, the argument must have been raised sufficiently for the trial court to rule on it." *A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 338 (9th Cir. 1996).[23]

**[16]** In any case, we reject this argument as well. First, while the Supreme Court and this court have subsequently found various other remedial schemes to be "special factors" precluding *Bivens* relief, *see*, *e.g.*, *Chilicky*, 487 U.S. at 425; *Kotarski v. Cooper*, 866 F.2d 311 (9th Cir. 1989), those decisions have not overruled *Carlson*'s square holding that there are no special factors that preclude a *Bivens* action in a case whose facts and posture mirror this one. 446 U.S. at 19 (holding that "the case involves no special factors counseling hesi-

---

[23]For this reason, we will not pass on Cmdr. Henneford's assertion in his opening brief that the complaint does not aver sufficient facts to establish his personal involvement in the alleged constitutional deprivation.

tation in the absence of affirmative action by Congress"). As noted earlier, here, as in *Carlson*, we have an individual who has died, allegedly due to the deliberate indifference of the federal officials charged with his health and safety. As in *Carlson*, the decedent's survivors bring a *Bivens* action premised on violations of the Fifth and Eighth Amendments, and the officials argue that no *Bivens* remedy is available. Because the present case is functionally identical to *Carlson*, *Carlson*'s holding that no special factors preclude *Bivens* relief is binding on this court.[24]

[17] Second, "*Chilicky* and *Kotarski* hold that courts should not create a *Bivens* remedy where the complexity of a federal program, including a comprehensive remedial scheme, shows that Congress has considered the universe of harms that could be committed in the program's administration and has provided what Congress believes to be adequate remedies." *Adams*, 355 F.3d at 1185. The FTCA is not such a scheme, for the simple reason that it does not provide remedies that Congress believes to be adequate: It provides the remedies that individual *states* believe to be adequate remedies for common law torts. Congress did not "deliberately craft" "a comprehensive remedial scheme" when it adopted the FTCA's remedies; rather, it delegated the underlying remedies to state legislatures and courts. We do not believe that Congress intended to delegate to the states the mechanism by which violations of federally established rights are remedied. As noted above, the remedies we and the Supreme Court have held to preclude *Bivens* were deliberately crafted by Congress and applied uniformly throughout the republic. We are aware of no case holding a remedial scheme that is entirely parasitic on state law to be a substitute for a *Bivens* remedy. Instead, the Supreme Court has announced its skepticism regarding any such remedial scheme: "The question whether [an] action for violations by federal officials of federal constitutional

---

[24]For the same reason, our decision does not extend *Bivens* into a new context. *Cf. Commercial Serv. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).

rights should be left to the vagaries of the laws of the several States admits of only a negative answer in the absence of a contrary congressional resolution." *Carlson*, 446 U.S. at 23. Accordingly, the statutory remedies provided in the FTCA do not constitute a comprehensive remedial scheme and cannot serve as a "special factor" precluding *Bivens* relief.[25]

## Conclusion

We agree with the district court that § 233(a) does not entitle the PHS Defendants to absolute immunity from constitutional torts.[26]

**AFFIRMED.**

---

[25]Defendants point to no other special factors counseling hesitation in the present case. This is to be expected, because Castaneda "seek[s] a cause of action against an individual officer, otherwise lacking, as in *Carlson*." *Malesko*, 534 U.S. at 74. The case does not involve any of the other special factors that the Supreme Court has held preclude *Bivens* relief: a lawsuit against a federal agency or private corporation, *see Malesko*, 534 U.S. 61; *FDIC v. Meyer*, 510 U.S. 471 (1994); the "unique disciplinary structure of the Military Establishment," *United States v. Stanley*, 483 U.S. 669 (1987); *Chappell v. Wallace*, 462 U.S. 296 (1983); or a constitutional claim that cannot be defined into "a workable cause of action," *Wilkie v. Robbins*, 127 S. Ct. 2588 (2007). Defendants simply ask us to revisit *Carlson*'s holding that the FTCA is not a "special factor." This we decline to do.

[26]Because *Carlson* requires us to affirm, as discussed throughout this opinion, we need not reach the issues of statutory construction which underlie the district court's opinion.